STATE OF NORTH CAROLINA v. JAMES WALLACE JACKSON

No. 300A82

(Filed 7 July 1983)

1. **Criminal Law § 76.7— confession—voir dire hearing to determine admissibility—sufficiency of findings**

    In a prosecution for first degree murder where there was a voir dire hearing to determine the admissibility of defendant's confession, although some findings might have been more appropriately designated as mixed findings of fact and law and where other "findings" were rather discussions of law, defendant did not argue that he was prejudiced in any way by their being erroneously denominated as findings of fact rather than conclusions of law, and all of the "findings" were supported by competent evidence.

2. **Criminal Law § 75.9— trickery by officers—confession not rendered inadmissible**

    In a prosecution for first degree murder, the trial court properly found that defendant's confession was not constitutionally impermissible since the defendant was never in custody or under arrest before he confessed; he was told by an officer on the day he confessed that he was free to go at any time; he was not restrained, touched, threatened, or intimidated; he was taken where he wanted to go after the first two sessions with the officers; he walked to the police station one day; there was at least a week between the second and third interviews; defendant had an extensive criminal history and had previous experience with interrogation; the defendant was repeatedly given proper *Miranda* instructions although he was not in custody; the officers attempted to deceive defendant and lied to him about the evidence they had; defendant also made misrepresentations to the officers and was aware to some extent that the officers were not truthful with him; defendant was not questioned for undue periods of time, and no promises or threats were made to him. No "seizure" of defendant occurred within the meaning of the Fourth Amendment, and although the officers' actions in deceiving and lying to the defendant are not condoned by the courts, standing alone, they were not sufficient to render defendant's confession inadmissible.

3. **Criminal Law § 75.9— test of voluntariness of confession**

    The North Carolina test to determine the admissibility of a confession is whether the confession is voluntary under the totality of the circumstances of the case. It has never been held by the Court that a confession is inadmissible in evidence unless it is "attributable to that love of truth which predominates in the breast of every man." Therefore, the trial court in suppressing defendant's confession erred in applying such a standard in determining the voluntariness of that confession.

    Justice MITCHELL concurring.

    Justice EXUM dissenting.

    Chief Justice BRANCH and Justice FRYE join in this dissent.

APPEAL of right by the State of North Carolina pursuant to N.C.G.S. 15A-979(c) and Rule 4 of the North Carolina Rules of Appellate Procedure from an order entered by *Brannon, J.,* 18 February 1982 Criminal Session of WAKE County Superior Court.

Defendant was charged in a proper indictment that on 15 March 1981 he committed murder in the first degree of Leslie Hall Kennedy. This bill of indictment was returned on 27 April 1981. On 10 July 1981, defendant filed a motion to suppress the use of all evidence in the possession of the state consisting of oral and written statements taken from defendant by law enforcement officers. In his motion defendant alleges that the statements were taken from him in violation of his rights under the constitutions of the State of North Carolina and the United States and contrary to the decided case law of the Supreme Court of North Carolina. On 14, 15 and 16 October 1981, the trial court heard evidence relative to this motion, and on 15 December 1981 the court heard statements and arguments of counsel for the defendant and the state. Thereafter, on 18 February 1982, the court signed and entered an order allowing the motion of the defendant and suppressing the use of the oral and written statements and confessions made by the defendant. From this order the state appealed to this Court. The defendant also filed exceptions to certain findings of fact and conclusions of law which were brought forward and argued in his brief.

*Rufus L. Edmisten, Attorney General, by Joan H. Byers, Assistant Attorney General, for the state.*

*Gerald L. Bass for the defendant.*

MARTIN, Justice.

The pertinent portions of the order entered by the trial court are:

THIS CAUSE coming on to be heard and being heard upon the defendant's Motion to Suppress any and all statements of his made to police officers on April 8, 1981, and dated and filed of record on July 10, 1981, the defense acknowledging there is no constitutional objection to any statement given prior thereto; and the Court having heard evidence on October 14, 15 and 16, 1981, and thereafter the statements and

arguments of counsel for the defendant and of the Assistant District Attorney were heard on December 15, 1981, makes the following Findings of Fact and mixed Findings of Fact and Conclusions of Law, all findings of fact being found by at least a preponderance of the evidence.

(1) That defendant was personally present in open Court with his counsel;

(2) That this evidentiary hearing was held in the absence of a jury;

(3) That the Court has had an opportunity to see and observe each witness and to determine what weight and credibility to give to each witness' testimony, including the defendant.

(4) That on or about the 15th day of March, 1981, the Major Crimes Task Force of the Raleigh Police Department, Raleigh, North Carolina, was assigned to investigate the homicide-death of Leslie Hall-Kennedy . . . .

(5) . . . That Ms. Hall-Kennedy had been stabbed twice in the back with one exit wound over her left breast. That while at the scene Detective Williams interviewed the three occupants of a rear apartment who had discovered the body. That the two men and one woman described a fourth individual, a young black male, who had also been at the scene when the body was found, prior to the police arriving. . . .

(6) That a search of Ms. Hall-Kennedy's apartment on March 15 and 16, revealed that the only item missing was a J. H. Hinckle brand, Kitchen knife . . .

(7) . . . [T]hat through the efforts of the three witnesses who had seen the black male on March 15, 1981, at 207 Cox Avenue, the defendant James Wallace Jackson was identified as that man;

(8) That sometime prior to March 26, 1981, Detective A. L. Watson and Detective John Beasley called the defendant's mother and left a message for the defendant to call them. That on March 26, 1981 at 5:30 p.m. the defendant called those officers and they came to the defendant's mother's house and picked him up. That the officers told the

defendant who they were and that they wanted to talk with him as a possible witness. That they did not place the defendant under arrest. That after arrival at the Investigative Division at about 6:00 p.m., the defendant was fully advised of his MIRANDA rights, understood those rights, never requested an attorney, and waived those rights in writing. That Detective Watson and Detective Beasley interviewed the defendant for about one hour. That Detective Mack then interviewed the defendant for about one hour and forty-five minutes. That at the completion of this interview, Detective Williams, Watson and Mack took the defendant to his mother's house and let him out of the car, and that the defendant agreed to return to the Investigative Division for further interviews and to take a polygraph test the next day;

(9) [Set out hereinafter.]

(10) [Set out hereinafter.]

(11) [Set out hereinafter.]

(12) That on March 27, 1981 at 10:00 a.m., the defendant arrived at the Investigative Division. That he walked from his mother's house to that location. That the defendant was advised of his MIRANDA rights by Officer Knox, waived those rights in writing, and voluntarily took a polygraph test. That after the interview with Officer Knox at about 1:00 p.m., the defendant was interviewed by Detective Mack and Detective Privette. That this interview lasted until about 5:00 p.m. when Detective Watson took the defendant to Hargett Street and let the defendant out of the car. That the defendant was not under arrest;

(13) . . . Detective Mack has met and interviewed the defendant in connection with two other investigations; one being an attempted rape at Dorothea Dix Hospital, the other a rape and armed robbery at a fast food place of business. . . .

(14) . . . That prior to the asking of questions the defendant was advised of his constitutional rights by Detective Mack. . . .

(15) That during this interview no threats or promises were made to the defendant, that the defendant never asked

for an attorney, or to leave the room or police station; that he appeared to know where he was and who Detective Mack was; that he did not appear to be under the influence of drugs or alcohol; and that the defendant acted quite normal and very similar in manner to past meetings with Detective Mack.

(16) That the defendant gave an exculpatory statement indicating he went with other persons who had heard screams or other sounds into the apartment of Leslie Hall-Kennedy on March 15, 1981; handled a file, and handled the victim, raising her up to see if she was alive, but that he did not commit the homicide; that he had washed his hands and used the bathroom at a nearby apartment afterwards. That the interview lasted about two and one-half hours to three hours. That after the interview concluded the defendant left, being told the officers would be getting back in touch with him. That no promises or threats or hope of reward for a statement were made to the defendant during the interview.

(17) That the defendant did not see any of these police officers again until approximately 6:00 p.m. on April 8, 1981, when Detective Williams approached the defendant on Hargett Street and told the defendant that Detective Mack wanted to talk with him about the murder on Cox Avenue. That Detective Williams did not place the defendant under arrest and the defendant voluntarily got into the car and came to the station. That every time the defendant was interviewed by the police they advised him of his MIRANDA rights . . . .

(18) That on March 31, 1981, a J. H. Hinckle brand kitchen knife, with a blade ten inches long, was found near the railroad tracks which are in the area of Cox Avenue. That this knife was identical to the knife missing from the set in Ms. Hall-Kennedy's apartment. . . .

(19) . . . That Detective Williams obtained a knife identical to State's Exhibit 3, pricked his own finger, placed his blood on the blade of the knife and placed his right thumb print in the blood. That Detective Williams then had two photographs prepared of that print and marked as Detective Parker had requested. . . .

(20) That Detective Williams knew when he prepared State's Exhibit 1 and 2 that no fingerprints or blood were on the knife, State's Exhibit 3, which the officers felt was the murder weapon; that Detective Williams knew the defendant had been interviewed on March 26 and 27 and knew that the defendant had denied the homicide while admitting part of what the witnesses had said and denying part;

(21) That at about 6:00 p.m. on April 8, 1981, Detective Williams saw the defendant on Hargett and Haywood Streets in Raleigh. That Detective Williams stopped his car and the defendant came up to it. That Detective Williams identified himself to the defendant orally and by showing his police identification. That the defendant was asked to get in the car and he did so voluntarily. That Detective Williams advised the defendant that the police wanted to talk with the defendant about this homicide and that Detective Mack would interview him. . . .

(22) That Detective Williams did not know if the defendant had eaten and did not offer any food to him. That Detective Mack was a black detective assigned to this investigation, the others being white.

(23) That on April 8, 1981 at about 8:00 p.m., Detective Parker was called and came to the Investigative Division to interview the defendant. . . .

(24) That Detective Mack interviewed the defendant on April 8, 1981 beginning at about 6:20 or 6:30 p.m. in the same room at the Investigative Division. . . . That the defendant's appearance was the same as on March 27; that he never asked for a lawyer, was never threatened or promised anything in exchange for his signature on the State's Exhibit #5, or promised or threatened in any way to make a statement. That the defendant was aware that he was free to leave whenever he felt like it from the outset of the interview and he never asked to leave or got up to leave. That Detective Mack never told the defendant he could not leave, that Detective Mack told the defendant he was not under arrest at the outset of the interview and that the defendant was told he was not in custody. He was not handcuffed and the interview room door was not locked.

(25) That this interview with Detective Mack lasted from 6:30 p.m. until 10:00 p.m., everyone being seated and Detective Mack speaking in a normal voice. . . . That the officer had a knife in the interview room, that the knife was not exhibited directly to the defendant, nor was he shown fingerprints or blood or photographs of fingerprints. That the defendant was truthfully informed where and when the knife, State's Exhibit #3 was found and asked a question: How he would explain his fingerprints on the knife? (Detective Mack did not tell him that his fingerprints were on the knife.) That Detective Mack's intent was to find out if he'd offer an explanation or deny it. That the defendant said his fingerprints could not be on the knife.

(26) That Detective Mack was aware of the existence of State's Exhibit #1 and #2, and how they happened to be created and how these exhibits were to be used during the interview of the defendant. . . .

(27) [Set out hereinafter.]

(28) That during this same interview Detective Mack told the defendant that a witness had seen him running from the victim's apartment; that this was not true in that the witness could not identify the defendant and that the person seen was running down Cox Avenue and not from the apartment;

(29) That there was a plan of approach by the officers for their interview with the defendant on April 8, 1981. Officer Mack was to interview the defendant and obtain as much information as he could regarding this incident, dealing also with discrepancies in the defendant's statements. If the discrepancies still existed (they apparently did) and if the defendant was unable to give an explanation for them (he apparently could not) then Officer Parker was to take over the interview.

(30) That Detective Mack spoke to the defendant about emotions in a jury trial . . . .

(31) . . . That Detective Mack told the defendant that if the defendant's girl friend were pregnant, and the defendant were convicted, then in all probability it would be unlikely

that the defendant would raise his child; and that Detective Mack said this to get the defendant to comprehend the seriousness of his situation, this being a real circumstance.

(32) That Detective Mack told the defendant that the defendant had friends in the interview room; that Detective Mack said this to keep the defendant from being alienated or hostile, the officers not having anything against him, and to obtain a truthful statement which would clarify the discrepancies and inconsistencies in the prior two statements; and, any other statement which would have been a complete and honest statement would have been as acceptable to the officers.

(33) That during the interview on April 8, 1981, Detective Mack twice displayed several color photographs of Leslie Hall-Kennedy to the defendant; that this was done to show the defendant the appearance of the scene and to be used by the defendant to explain his activities when he was at the scene on March 15, 1981, and inconsistencies in his earlier statements;

(34) That during the interview on April 8, 1981, Detective Mack indicated to the defendant that there were discrepancies and inconsistencies in the defendant's statement and when these statements were compared with other evidence; and that Detective Mack did indicate that something just wasn't right and that the defendant had discrepancies in his statement that the police needed to clarify, and that Detective Mack told the defendant that he thought the defendant had committed the homicide, but Detective Mack did not call the defendant a murderer;

(35) That the statement Detective Mack sought from the defendant was a truthful statement which would clarify the discrepancies and lead to a situation where the defendant was no longer a suspect or became a stronger one . . . .

(36) That during the April 8 interview the defendant's demeanor was very calm, casual, never upset, even through the confession he was very calculating and calm. That the defendant showed no emotion throughout any of the interviews or the writing out of his statement. . . . That no officer

ever physically threatened or made a show of force toward the defendant. That the defendant never requested to speak with family members or an attorney or anyone other than the police officers;

(37) That at about 10:00 p.m. on April 8, 1981, Detective Mack and Detective Privette left the defendant in the interview room; that the defendant continued to deny having committed the homicide during this interview; that the defendant had not requested nor been given food;

(38) . . . That at 10:00 p.m. Detective Mack asked Detective Parker to interview the defendant and Detective Parker, alone, entered the interview room having State's Exhibit #1 and #2 and a cassette tape recorder and two cups of ice water in his possession;

(39) . . . That Detective Mack introduced Detective Parker to the defendant by name and as a police officer as Detective Parker had never seen the defendant before that day. That Detective Mack left the room and the defendant and Detective Parker were alone;

(40) That Detective Parker gave a cup of water to the defendant, seated himself across from the defendant, introduced himself by name, asked the defendant if he had been advised of his rights, he said he had, and told the defendant that Detective Parker's job was to examine physical evidence which would be presented in court but that he was not directly involved in the investigation himself. That Detective Parker laid State's Exhibit #1 on the left side of the table, put State's Exhibit #2 (photographs resembling a fingerprint exhibit) next to #1 (the police prepared knife), and placed a tape recorder on the right side of the table;

(41) That Detective Parker then engaged the defendant who was seated, in a general conversation in a normal tone of voice . . . . That the defendant was polite, attentive and listening;

(42) That Detective Parker then told the defendant that he would like to go over some of the physical evidence obtained at the crime scene and the defendant said fine; that Detective Parker told the defendant: that a murder weapon,

a knife, had been found near some railroad tracks near the crime scene; that the murder weapon contained a bloody fingerprint; that the defendant's fingerprints had been photographed; and that Detective Parker had taken the murder weapon to the FBI and a laser beam had lifted the fingerprint from the weapon;

(43) That Detective Parker then pushed State's Exhibit #1 over to the right side of the table and out of the way; and then showed the defendant the two photographs, State's Exhibit #2;

(44) [Set out hereinafter.]

(45) That Detective Parker asked the defendant if he had lied to Detective Mack and the defendant said he had; that the defendant then asked to speak to Detective Mack again; that Detective Parker left the interview room at 10:20 p.m.;

(46) That at 10:20 p.m. Detective Mack entered the interview room and talked with the defendant until 11:15 p.m. That during this time the defendant admitted touching the knife but continued to deny the murder of Leslie Hall-Kennedy. New discussion items were added, such as an afghan found on the dead girl's porch, which the defendant would probably have had to have been there to know about. When asked about it by Detective Mack after Detective Parker had interviewed him after 10 p.m., April 8, 1981, the defendant indicated he'd picked it up from a couch or chair inside the house and had attempted to open the front door with it (Detective Mack assuming the defendant did this to keep his fingerprints from getting on the front door, and being dropped by the defendant on his way out).

(47) That at about 11:15 p.m. Detective Mack left the interview room and Detective Parker entered. That Detective Parker asked the defendant if he was tired and the defendant said a little bit, but not too tired. That Detective Parker asked the defendant if he wanted a cup of coffee; that the defendant did and that Detective Parker got both himself and the defendant cups of coffee;

(48) . . . That Detective Parker then told the defendant the following: that the police had a murder weapon; had the

defendant's fingerprints; had the defendant's fingerprints on a knife sharpener found at the scene; had the defendant's fingerprints on a wooden post on the front porch, and had a witness who saw the defendant coming out the door carrying a knife. That these statements were not true. That the defendant responded that he did it. That Detective Parker then told the defendant that he knew the defendant did it and wanted to know why. That the defendant then told Detective Parker his version of what had occurred on March 15, 1981 at 207 Cox Avenue and admitted that he stabbed Leslie Hall-Kennedy. That the defendant talked for ten to fifteen minutes. That the defendant was attentive setting up, listened and responded to questions and appeared to Detective Parker to be normal and not fatigued. That the defendant was not angry or upset.

(49) That Detective Parker then told the defendant that he would like a written statement as to what the defendant had told him, that the defendant wanted to write the statement himself; that Detective Parker then gave the defendant paper and a pen. . . . That during the writing, the defendant stopped and took a break, going to the bathroom. . . . That when the defendant finished writing, Detective Parker asked him if the statement was voluntary and the defendant said yes and wrote on the statement that it was voluntary. . . .

(50) [Set out hereinafter.]

(51) . . . That Detective Parker had State's Exhibit #1 and #2 to convince the defendant that the police had certain evidence, not to put the defendant in fear. . . . That Detective Parker knew that all of the evidence which he recounted to the defendant was false. That Parker accepted all the defendant said as true and never said or told the defendant that he (the defendant) was lying; and, that during the final part of the discussion between the defendant and Detective Parker that Detective Parker told him (the defendant) that he (the defendant) could go into Court and plead not guilty and that the other officers would probably testify that the defendant was a black man raping and killing white women; that Detective Parker did not believe this and that, if the defendant wanted to tell Parker about it, Parker would

listen. This remark by Detective Parker had no effect on the defendant, if he even heard it, inasmuch as he doesn't recall it at this hearing. . . .

(52) That Detective Parker never knew what the defendant would respond to his review of the evidence; never tried to coerce or frighten the defendant or raise his voice to him, tried to get friendly with him and hoped for a truthful statement from the defendant.

(53) . . . That there were ten to fifteen other suspects in this case besides the defendant. That Detective Privette told the defendant that he (Detective Privette) thought the defendant had killed Ms. Kennedy but did not call him a murderer. That it would be best if the defendant would just tell the truth in the long run. That Detective Privette never threatened or promised the defendant anything or denied the defendant anything the defendant requested . . . .

(54) [Set out hereinafter.]

(55) That the defendant is twenty-two (22) years old and went to the tenth grade at Broughton High School. That on April 8, 1981 the defendant was living with his girl friend on Hargett Street and with his mother on Dorsett Street;

(56) That the defendant had served time in prison before March 15, 1981; being released on parole in September of 1980; that court-appointed attorneys had represented him on previous charges; that he was interviewed by police officers on those charges; that he was advised of his rights more than once in the past; that during the times he was interviewed with respect to the Kennedy homicide the defendant knew he had a right to a court-appointed attorney but never requested one. . . .

(57) That each and every time the police interviewed the defendant, the defendant, James Wallace Jackson, was given all of the warnings required by *MIRANDA v. ARIZONA*; that these warnings were complete, in detail, and fully complied with and even went beyond the requirements of *MIRANDA* . . . .

(58) That after being advised of his rights orally and in writing, the defendant waived his rights after being read a

written waiver of rights which the defendant read and said he understood . . . .

(59) [Set out hereinafter.]

(60) [Set out hereinafter.]

(61) That on April 8, the defendant was questioned by Detective Mack for about three hours; that the defendant never asked to leave or for an attorney; that Detective W. M. Parker questioned the defendant for about twenty minutes; that Detective Parker displayed for and told the defendant that the defendant's fingerprint had been found on the murder weapon which was false; that Detective Parker also told the defendant that the defendant had been seen running from the victim's apartment with a knife which was also false; that Detective Mack then questioned the defendant for about one hour; that Detective Parker than questioned the defendant for an additional hour during which time the defendant admitted committing the homicide and signed a handwritten statement . . . .

(62) [Set out hereinafter.]

(63) [Set out hereinafter.]

(64) [Set out hereinafter.]

(65) In the present case it simply cannot be said that the defendant made the admissions he did because he abstractively wanted to confess or because he spoke out in a completely spontaneous manner. . . .

. . . In a nutshell, the defendant figured the game was up and he'd best put the best face on it (the killing) that he could.

(66) [Set out hereinafter.]

(67) That all of the above findings of fact, as well as the last findings of fact and conclusions of law are found to exist and to be true by at least a preponderance of the evidence, the State bearing the burden of proof.

Upon the foregoing findings of fact the Court concludes as a matter of law that:

(1) None of the constitutional rights, either Federal or State, of the defendant, James Wallace Jackson, were violated by his interrogation, confession, or his detention and arrest after "confessing".

(2) There were no promises, offers of reward, or improper inducements to defendant to make a statement.

(3) There was no threat or suggested violence or show of violence to persuade or induce defendant to make the statements.

(4) The statements made by the defendant to the officers of the Major Crimes Task Force of the Raleigh Police Department on April 8, 1981, were made freely, voluntarily, and understandingly.

(5) Defendant was in full understanding of his constitutional right to remain silent and right to counsel, and all other rights;

(6) He freely, knowingly, intelligently, and voluntarily, waived each of those rights and thereupon made the statements to the officers above mentioned.

(7) That because the defendant "confessed" because he thought he'd been found out and caught, rather than because such confession was "attributable to that love of truth which predominates in the breast of every man, not operated upon by other motives more powerful with *him*," it is not admissible under State law.

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that the defendant's Motion to Suppress is denied on grounds that his Federal Constitutional Rights were violated but is granted on the grounds that his State Rights under the decisional law of the North Carolina Supreme Court was violated.

This the *18th* day of February, 1982.

Signed out-of-date and out-of-term by consent of the parties.

s/ ANTHONY BRANNON
ANTHONY BRANNON
Judge Presiding

The following is a typewritten copy of the defendant's confession, the original having been made by the defendant in his own handwriting:

On Friday 13th I met Leslie Hall Kennedy at Pullen Park. We walked around and talked for a while, then she gave me her address and told me to come by that following Sunday. I went over there at first I started not to go in so I walked down the street then I came back up. And I went to knock on the door and she open the door and I went in. We went back into her room. She got under the covers and I sat on the bed beside her. I had notice the knife on the table beside the bed. I guess she had been sharping it or was getting ready to. But I didn't pay it to much attention. I just sat there and we talked a while and then I was thinking that she was giving me a cue to get in the bed with her. So I started touching and feeling her. And this was going on for a few min. then she started streaming and I got scarded. I don's know what went through my mind at the time. I just paniced. And I picked up the knife and stabbed her in the back and jolted it some. She just kelp on streaming and I just ran out of the house and down the street towards Pullen Park. I had stopped at the path down the street and stuld there for a while. I was afraid and was hoping that I didn't kill her. And I wanted to see if she was still alive so I stuck the knife in the ground beside a tree and went back up the street. I guess when I realize what I had done it scared me cause I was hoping that I didn't kill her. When I got up the street I saw those guys standing in the yard. I didn't know what to say so I said a girl said that she heard somebody streaming up here. And one guy said yea! And they started walking towards the house and went with them. The tall guy went over and looked in through her window and then came back across the proch and went in the front door.

Me and the other guy followed him in the house. He got to the door of her bed room and saw her and just turn around and told us to go back out. We had started out the door and I was afraid telling them to hurry up and call the police and the ambulance. I just kept telling them that and I told the guy that I was going back in there to see if there were anything that I could do. He told me not to but I went

anyway. I went back there and she was lying there on her back and I just frosed and the guy that was at the door'kept calling me. When I went in there I just picked the fail up off of the basket and was holding it in my hands. And the guy kept calling me to come out and I trun around and started going back out. I was in the kitchen when I realize that I still had the fail in my hand so I started to put it on the stove and looked up and saw the rake that on the wall so I put it in there and came out the house. We walked around the side of the house to the other guy,s house behind hers. I was going to stand out side but the guy told me to come on in, so I went in the tall guy was on the phone and I stude there for a min. or two then ask him if I could use the bath room. He said yes I went in and used it and wash my hands and came back out. The tall guy was getting his girl friend to go home but she wouldn't go. So we went back outside and waited for the police to come. When they came they ask what was going on and the tall guy said that they heard somebody streaming in the room in front of them and they came out but didn't see nobody. The police said O.K. that's it and walked up to the house So I walked back down the street where I had stuck the knife in the ground and picked it up and through it down the railroad track and went home.

I voluntary gave this statement to Det. Parker on 4-8-81

James W. Jackson
4-9-81
1:15 am

Witness:
Det. W. M. Parker, Jr.

The evidence before the trial judge can fairly be summarized as hereinafter set forth. About 15 March 1981, the Major Crimes Task Force of the Raleigh Police Department was assigned to investigate the homicide of Leslie Hall-Kennedy. Mrs. Hall-Kennedy was in her mid-twenties of age and resided at 207 Cox Avenue in Raleigh. The Major Crimes Task Force consisted of detectives D. C. Williams, G. L. Mack, K. N. Privette, John Beasley, and one supervisor. Williams was the coordinator of this investigation. At about 11:00 p.m. on 15 March 1981, Detective Williams arrived at the dwelling house of Mrs. Hall-Kennedy and met with Dr. Laurin

Kaasa, the Wake County Medical Examiner, and Detective Beasley. The dwelling was divided into three apartments, each having a separate outside entrance. Williams went into the bedroom of the front apartment and observed the body of Mrs. Hall-Kennedy lying in a bed. Mrs. Hall-Kennedy had been stabbed twice in the back, with one exit wound over her left breast. A search of the apartment revealed that the only item missing was a J. H. Hinckle brand kitchen knife with a ten-inch blade. Later in the investigation Detective Williams obtained an identical knife and showed it to the pathologist, who gave the opinion that the knife could have been the murder weapon.

Detective Williams interviewed the three occupants of a rear apartment who had discovered the body. These witnesses, two men and a woman, described a young black male who had also been at the scene when the body was found, before the police arrived. The young black male left the scene shortly after the police arrived without giving a statement to them.

The detectives tried to learn the identity of the man who had left the scene to determine what information he had as a witness. Through the efforts of the three occupants of the rear apartment, the defendant, James Wallace Jackson, was identified as the young black male in question. Sometime before 26 March 1981, Detectives Watson and Beasley called the defendant's mother and requested that she ask the defendant to call them. On 26 March 1981 at about 5:30 p.m., the defendant did call these officers, and they came to defendant's mother's house. The officers told the defendant who they were and that they wanted to talk with him as a possible witness in the Hall-Kennedy murder case. The defendant was not placed under arrest, but he accompanied them to the Investigative Division. Upon arrival at the Investigative Division at about 6:00 p.m., the defendant was fully advised of his *Miranda* rights and waived those rights in writing. He never requested an attorney. Detectives Watson and Beasley interviewed defendant for about an hour, and Detective Mack then interviewed the defendant about an hour and forty-five minutes. After this was completed, Williams, Watson and Mack took the defendant to his mother's house and let him out of the car.

Defendant agreed to return to the Investigative Division for further interviews and to take a polygraph test the next day. The

detectives also asked the defendant to give them the shoes and pants he had worn on 15 March 1981. The defendant gave them a pair of shoes and pants, but they were not the shoes and pants the defendant had worn on 15 March. At the time the defendant gave the officers the wrong shoes and pants, he knew that he was not giving them the clothes that they requested. The shoes and pants given to the officers were tested at a later time, but no bloodstains were found upon those clothes.

On 27 March 1981, the defendant arrived at the Investigative Division at about 10:00 a.m., having walked there from his mother's house. He was again advised of his *Miranda* rights, waived those rights in writing, did not request an attorney at any time, and voluntarily took a polygraph test. After this was completed about 1:00 p.m., the defendant was interviewed by detectives Mack and Privette until around 5:00 p.m. when Detective Watson took the defendant to Hargett Street in the city of Raleigh and let the defendant out of the car. At no time on 27 March was defendant under arrest. During the interview on 27 March, Detective Mack told defendant that they had gotten some bloodstains off the pants that the defendant had given him the previous day and that tracks made by his tennis shoes were found by the police in the house. The defendant knew that this was not true because he knew that he had not given the officers the clothing that he had been wearing on the night of 15 March. On the 27th the defendant gave an exculpatory statement to the officers, indicating that he went with other persons into the apartment of Leslie Hall-Kennedy after they heard screams coming from the apartment and that while in the apartment he handled a file and touched the victim, raising her up to see if she was alive. He further stated that he did not commit the homicide; that he had washed his hands and used the bathroom at a nearby apartment. At the conclusion of this interview, the officers told the defendant that they would get back in touch with him later.

Defendant did not see or hear from any of these officers until about 6:00 p.m. on 8 April 1981 when Detective Williams approached the defendant on Hargett Street and told him that Detective Mack wanted to talk with him about the murder on Cox Avenue. The defendant was not arrested and he voluntarily got into the car with Officer Williams and went to the police station.

In the meantime, on 31 March 1981, a J. H. Hinckle brand kitchen knife had been found near the railroad tracks in the area of Cox Avenue. This knife was identical to the one missing from Mrs. Hall-Kennedy's apartment. The knife had no fingerprints or bloodstains upon it. Detective Williams obtained a knife similar to the one found on 31 March, placed blood on the knife and a fingerprint into the blood. He then had black and white and colored photographs made of the fingerprint and outlined as if an identification of the print had been made.

About 6:30 p.m. on 8 April 1981, defendant was again advised of all of his *Miranda* rights, waived those rights in writing, and consented to be questioned by the officers without the presence of an attorney. At this interview Detective Mack told the defendant he was not under arrest and that he was not in custody. He was not handcuffed and the interview room door was not locked. This interview with Detective Mack lasted from 6:30 until about 10:00 p.m. The knife which the officers had prepared with the blood and fingerprint was in the interview room, and the defendant was asked how he would explain his fingerprints on a knife which had been found near the scene of the murder. Defendant responded that his fingerprints could not be on the knife. During this interview Detective Mack explained to the defendant that the legal maximum punishment for murder in North Carolina was the death penalty. However, defendant was not threatened that if he did not cooperate he would get the death penalty. Detective Mack also told the defendant that a witness had seen the defendant running from the victim's apartment. This was not true, because the witness could not identify the defendant and the person seen was running down Cox Avenue and not from the apartment.

About 10:00 p.m., Mack and Privette left the defendant and Officer Parker went into the interview room. Parker gave the defendant a cup of water. The knife which had been prepared by the police was on the left side of the table with the photographs of the fingerprint. Parker talked with the defendant and told him that the murder weapon, the knife, had been found near the railroad tracks, that it contained a bloody fingerprint and that the fingerprint had been photographed and identified as the defendant's; that the photograph had been raised from the murder weapon by the use of a laser beam by the FBI. He also showed

the photographs of the fingerprint to the defendant and explained them to him. Defendant responded that his fingerprint was on the knife because he had picked up the bloody knife while walking down a path near the railroad tracks and threw it.

Defendant continued to deny committing the murder of Leslie Hall-Kennedy. About 11:15 p.m. Parker got coffee for himself and the defendant and went over the evidence again with the defendant, stating that the police had a murder weapon, they had defendant's fingerprints and the defendant's fingerprints at the scene, that they were on a knife sharpener and on a wooden post on the decedent's front porch, and that they had a witness who saw the defendant coming out the door carrying a knife. These statements were not true. At that point the defendant responded that he did it. Detective Parker told the defendant that he knew that defendant had committed the murder and wanted to know why. Defendant then told Detective Parker his version of what happened on 15 March and admitted that he had stabbed Leslie Hall-Kennedy. At this time defendant was attentive, sitting up, and listened and responded to questions and appeared to be normal and not fatigued. He was not angry or upset. Detective Parker requested that defendant give him a written statement as to what defendant had just told him. Defendant stated that he wanted to write the statement himself and was given paper and a pen. At this time the defendant wrote the statement which is set out above. When defendant completed writing the statement, the officer asked him if it was voluntary, and defendant replied yes and wrote on the statement that it was voluntary.

During all of his interviews on 26 March 1981, 27 March 1981, and 8 April 1981, defendant's demeanor was calm, cool and collected. He was never upset, emotional, or disturbed. None of the officers threatened the defendant in any way nor did they promise him anything in order to obtain a confession or statement from him. During this entire time the defendant was never placed under arrest or in custody until after he made the confession. Defendant was twenty-two years of age and went to the tenth grade at Broughton High School. He had served time in prison, having been released on parole in September of 1980. He had been represented by court appointed attorneys on previous charges and had been interviewed by police officers at various

times in the past. At no time during any of the investigations did the defendant ask to have an attorney present while he was being questioned.

### DEFENDANT'S ASSIGNMENTS OF ERROR

[1]  Defendant contends that findings of fact 9, 10, 11, 27, 44, 50, 54, 59, 60, 62, 63, 64, and 66 are not supported by the evidence. Defendant did not except to any other findings of fact. Findings of fact made by a trial judge following a voir dire hearing on the voluntariness of a confession are conclusive upon this Court if the findings are supported by competent evidence in the record. *State v. Rook,* 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied,* 455 U.S. 1038 (1982); *State v. Pruitt,* 286 N.C. 442, 212 S.E. 2d 92 (1975). No reviewing court may properly set aside or modify those findings if so supported. *State v. Rook, supra; State v. Barber,* 278 N.C. 268, 179 S.E. 2d 404 (1971). This is true even though the evidence is conflicting. *State v. Rook, supra; State v. McRae,* 276 N.C. 308, 172 S.E. 2d 37 (1970).

We now turn to examine the findings which defendant alleges are not supported by the record.

Finding of Fact (9):

That after the interview on March 26, 1981, the officers asked the defendant to give them the shoes and pants he was wearing on March 15, 1981. That the shoes and pants he gave the officers and which were later tested and found negative for the presence of bloodstains, were not the shoes and pants the defendant was wearing on March 15th and the defendant knew these shoes and pants were not the ones asked for by the officers because they were not the clothes he was wearing that night; that this falsehood was the first one told to anyone in this case and it was told by this defendant to the investigating officers at the end of the very first interview, when they were talking to him as a possible witness;

Defendant does not argue that the facts stated in this finding are not accurate. He argues, rather, that there is no evidence to support the court's conclusion that this event constituted the first "falsehood" in the case. On the contrary, the evidence shows that by giving the officers clothes that he knew were not the ones he

had worn on 15 March 1981, defendant committed the first act of deception. The record further shows that the first possible misrepresentation by the police to Jackson occurred after defendant's misrepresentation concerning the clothes that he gave the officers. On 27 March, Officer Mack stated to defendant that they had discovered blood on the pants which defendant had given them. Of course, defendant knew that this was a misrepresentation because he knew that the pants which he had given the officers were not the ones which he wore on the day of the killing. We hold that this finding of fact is supported by competent evidence.

Finding of Fact (10):

That on March 27, 1981, when Detective Mack was interrogating defendant, Mack told him they'd gotten some bloodstains off the pants of this defendant and tracks made by his tennis shoes were found by the police in the house. The defendant knew this was not true inasmuch as he knew he'd given them false answers about the clothing he'd been wearing the night of March 15 at the time he gave them the "false clothing". So at least by this point in time he was fully aware that each side was not going to be overly truthful with the other side as to what the evidence was and what it was not;

Again, defendant does not argue that the account of events set out in this finding of fact is inaccurate but argues that the court's statement that defendant was fully aware that each side was not going to be overly truthful with the other side is unsupported by the evidence. To the contrary, we hold that the record does support the finding that defendant knew that each side was not going to be overly truthful in the investigation. Defendant knew that he had not given the officers the clothes that they requested, and the defendant also knew that the officers had misrepresented the facts to him when they stated that they had found blood upon those clothes, as the defendant knew there was no blood on those pants because they were not the ones that he wore at the time of the murder. Therefore, defendant knew that he had misrepresented the facts to the officers, and he also knew that the officers had misrepresented the facts to him. The finding is supported by competent evidence.

Finding of Fact (11):

That the defendant's demeanor during each of the interviews was calm; that if he was scared he did not show it; and that his demeanor at all times was no different than it was in Court at this hearing and the Court has observed that at all times during this hearing over a three-day period, the defendant has been cool, calm, composed, and collected and has answered each question only as he wanted the words to be uttered and to sound in the record;

All of the officers testified that the defendant was calm and deliberate during each of the three interviews. They stated that he carefully reflected before answering the questions of the officers. The testimony further states that at no time did the defendant become emotional or upset. Defendant himself testified at the hearing that he was calm during the interviews of March 26 and 27 and that in fact he was "no different than what I am now." The trial judge having had the opportunity to see and observe the defendant during the hearing, described the demeanor of the defendant at the hearing as calm, cool, composed, and collected. This finding of fact is supported by competent evidence.

Finding of Fact (27):

That during this interview detective Mack told the defendant that the legally mandated maximum punishment in North Carolina for a capital offense was the death penalty; the defendant was not told that if he did not cooperate he would get the death penalty. The defendant was told tht whether or not a defendant got the death penalty depended on the circumstances under which the crime was committed. That this and all other mention of the death penalty was to enable the defendant to understand the seriousness of his situation; and not to frighten him, intimidate him or cause the defendant to cooperate with Detective Mack; and, that whether it could apply to him called for judgment on his part alone. The Court notes that it is permissible for trial counsel in N.C. to tell the jury what the statutory punishment for a given offense actually is and; therefore, what the consequences of their verdict may be. It is said that this is allowed

for the purpose of impressing upon the jurors the importance of what they are about to consider.

It would seem to be equally fair to tell a potential defendant what the punishment is and consequences are for a particular crime, in order to make him fully cognizant of the possible consequences of his words to the police, if he chooses to say anything at all.

At least one opinion (dissenting) of our State Supreme Court tends toward the view that in order to secure a valid statement the defendant would have to know of the possible death penalty involved. *S. v CARTER,* 296 NC 354 (1978) [296 N.C. 344, 250 S.E. 2d 263, *cert. denied,* 441 U.S. 964 (1979)].

Defendant argues that the trial judge equated the right of trial counsel to inform the jury of the statutory sentence for an offense with the right of detectives to talk with a defendant about the death penalty. A proper reading of this finding of fact does not sustain defendant's interpretation. The court used the right of counsel in arguing to the jury in capital cases as an analogy to officers advising defendants of the death penalty and concluded that the purpose of counsel in making this argument to the jury was to impress the jurors with the importance of what they are about to consider. By analogy, the purpose of the detectives making these observations to a defendant is to impress upon him the seriousness of the matter in question. We hold the finding is supported by competent evidence.

Finding of Fact (44):

That Detective Parker showed the defendant the color photograph first; that Detective Parker told the defendant that each line represented a point of identification; that five points were needed to make an identification; and asked the defendant how many points the defendant saw. That the defendant responded seven. That detective Parker then showed the defendant the black and white photograph and asked how many points he saw. That the defendant responded eight. That Detective Parker told the defendant that the police had the murder weapon and the defendant's fingerprints. That Detective Parker then asked the defendant why the defendant's fingerprints were on the murder weapon.

That the defendant then said he had picked up the bloody knife and while walking down a path near the railroad tracks threw it, and that is how his fingerprints got on the knife.

Police trickery has frequently been discussed in the context of confession. Even those who decry it acknowledge that it is clearly not "per se" illegal. [White,] POLICE TRICKERY IN INDUCING CONFESSIONS, 127 Univ. of Penna. L.R. 581 (1979). (For a view virtually espousing it, see [Grano,] VOLUNTARINESS, FREE WILL AND THE LAW OF CONFESSIONS, 65 Va. Law Review 859 (1979)).

The general rule in the United States appears to be that "while the indulgence in deceptive methods or false statements is not morally justifiable or a commendable practice, this alone does not render a confession of guilt inadmissible . . . *if the means employed were not calculated to procure an untrue statement.*" (emphasis added) CONFESSION —FRAUD—TRICKERY—EFFECT, 99 American Law Reports 2d, 712. What is noteworthy is that all of the techniques used by the Raleigh Police in this case in connection with this defendant are police techniques discussed and advocated by the leading author and authority in this area, Fred E. Imbau [*sic*], Professor of Law at Northwestern University, in his textbook CRIMINAL INTERROGATION AND CONFESSIONS, 2nd Ed. (1967) *written after* the *MIRANDA v ARIZONA*, 384 US 436 (1966), decision. The U.S. Supreme Court seems to be of the same view. In *FRAZIER v CUPP*, 394 US 731 [22 L. Ed. 2d 684] (1969), three years after *MIRANDA*, Mr. Justice Marshall, for a unanimous Court, held that "The fact that the police misrepresented [evidence] is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible. These cases must be decided by viewing the 'totality of the circumstances' . . . ."

This Court finds that the techniques used by the Raleigh Police in their interviews with this defendant were not such as were apt to make an innocent person confess, which is the constitutional test set forth in CRIMINAL INTERROGATION AND CONFESSIONS, supra, at p 163, as being "the only test that is fair both to the public and to the accused or suspected individual." The means employed in the case at hand had no

tendency to produce a confession that was not in accord with the truth.

Defendant argues that the finding by the court that the techniques used by the police in their interviews with the defendant were not such as to make an innocent person confess is not supported by the evidence. The basic technique used, as stated by the court in findings of fact (42) and (44), was to tell the defendant that the police had recovered certain items of physical evidence which implicated him and then ask the defendant to explain this evidence. It is true that the officers made false statements in so doing and in using trickery with their presentation to the defendant. The use of trickery by police officers in dealing with defendants is not illegal as a matter of law. *See generally* Grano, *Voluntariness, Free Will, and the Law of Confessions*, 65 Va. L. Rev. 859 (1979); White, *Police Trickery in Inducing Confessions*, 127 U. Pa. L. Rev. 581 (1979). The general rule in the United States, which this Court adopts, is that while deceptive methods or false statements by police officers are not commendable practices, standing alone they do not render a confession of guilt inadmissible. The admissibility of the confession must be decided by viewing the totality of the circumstances, one of which may be whether the means employed were calculated to procure an untrue confession. *Frazier v. Cupp*, 394 U.S. 731, 22 L. Ed. 2d 684 (1969); *State v. Rook, supra*, 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, 455 U.S. 1038 (1982). False statements by officers concerning evidence, as contrasted with threats or promises, have been tolerated in confession cases generally, because such statements do not affect the reliability of the confession. *Confessions*, 79 Harv. L. Rev. 935 (1966); *Hopt v. Utah*, 110 U.S. 574, 28 L.Ed. 262 (1884); *Moore v. Hopper*, 389 F. Supp. 931 (M.D. Ga. 1974), *aff'd*, 523 F. 2d 1053 (5th Cir. 1975); *Roe v. People of State of New York*, 363 F. Supp. 788 (W.D.N.Y. 1973), *aff'd*, 495 F. 2d 764 (2d Cir. 1974). Although this finding might be more appropriately designated a mixed finding of fact and law, it is supported by the evidence.

Finding of Fact (50):

That Detective Parker never threatened or promised the defendant anything in order to obtain State's Exhibit #6. That the defendant never requested to leave the interview

room (except to go to the bathroom — which he did), or made any requests that were denied; that the defendant never requested to speak with anyone except the officers; and

Defendant objects to the portion of this finding of fact which states that Detective Parker never threatened the defendant in order to obtain the confession. Defendant's argument is based upon Officer Parker's statement to him that he could plead not guilty and that the other officers could probably go into court and testify that defendant was a black man, killing and raping white women, but that he (Parker) did not believe that. Defendant did not remember this statement at the hearing before Judge Brannon. Defendant did not testify that Officer Parker or anyone else threatened him. Officer Parker testified that he did not threaten the defendant and that the statement was made to encourage the defendant to give his version of the incident. The technique of describing the crime in more vicious terms than it actually probably happened is used by police officers in an effort to get the suspect to explain what he claims really happened. F. Inbau and J. Reid, *Criminal Interrogation and Confessions* (2d ed. 1967). Further, defendant did not confess at the time Parker made the statement. Even official misconduct, so long as it did not play a role in securing a confession, does not call for suppression of evidence. *See Dunaway v. New York*, 442 U.S. 200, 60 L.Ed. 2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 45 L.Ed. 2d 416 (1975). The finding is supported by competent evidence.

Finding of Fact (54):

That the defendant was never placed under arrest prior to the end of the third interview on April 9th and 10th, 1981; that he never asked for a lawyer, although he knew he could have such; that he never asked to go home; that the officers took him home and released the defendant after the first two interviews; that the defendant knew he had not been charged or arrested; that the defendant never asked for and was never offered food but was given water and coffee. That the defendant at all times prior to his arrest at the end of the third interview, was not in custody nor was his freedom restrained in any significant way, so there was no legal requirement to give him the *MIRANDA* warnings that he was given each time.

Defendant argues that this finding is erroneous and unsupported by the evidence when it states that defendant was never in custody, never under arrest, and his freedom was never restrained in any way during the interviews prior to the time he made the confession. Defendant observes that all of the interviews were in the Investigative Division of the Raleigh Police Department in a room 10 feet by 10 feet, with a table and two chairs. The room contained a one-way mirror, and there were many officers in the building. He states that the officers never told him that he could leave.

The defendant was never placed under arrest. He never asked for a lawyer, although he was well aware that he could have one. He was taken home by the officers on the 26th and 27th of March, and on the 27th of March, after defendant received the officers' message, he voluntarily walked to the police station. At no time was he ever handcuffed nor were any doors locked behind him.

Officer Williams described how defendant arrived at the police station on 8 April as follows: "I pulled my car up beside him. He walked up to the car. I told him who I was and we wanted to talk with him again in reference to the murder on Cox Avenue, and he says okay and got in the car." At that time defendant was not placed under arrest. Officer Williams further testified that at one interview defendant had the run of the building, going to the bathroom anytime he wanted to. Detective Mack testified that during the interview of 27 March, he advised the defendant that he was free to leave if he wanted to, and after the completion of the interview, the officers did take him where he wanted to go. Again, on the interview of 8 April, Officer Mack advised the defendant that he was free to leave if he wanted to do so. He was made aware of that from the outset of the interview. Even Jackson testified at least three times that he was never placed under arrest during the interviews. He stated that on 8 April the officers did not say he was under arrest but that they just wanted to talk to him. He got into the police car voluntarily.

The test to determine custody is whether a reasonable person in the suspect's position would believe himself to be in custody or that his freedom of action was deprived in some

significant manner. *Oregon v. Mathiason*, 429 U.S. 492, 50 L.Ed. 2d 714 (1977); *Moore v. Ballone*, 658 F. 2d 218 (4th Cir. 1981); *State v. Davis*, 305 N.C. 400, 290 S.E. 2d 574 (1982). *See United States v. Mendenhall*, 446 U.S. 544, 64 L.Ed. 2d 497 (1980). The evidence in this case clearly indicates that had the defendant chosen to get up and leave the detective offices at the time he gave his confession, rather than stay and make that confession, the officers would not have hindered his departure. We find that the facts in this case are very close to those in *Davis, supra.* In *Davis*, the defendant came to the police station voluntarily and unescorted on one occasion, pursuant to a request from the officers. He was questioned about a murder and denied any implication in it. He was also requested to take a polygraph examination and refused to do so. Thereupon, he was allowed to leave and was given a ride home. Later, the officers asked to see the defendant at the police station, and he agreed to meet with them at that time. They drove through his neighborhood and gave him a ride to the station. He was questioned in comfortable surroundings and his physical needs were cared for. The Court in *Davis* held that the defendant was not in custody.

Likewise, in this case we hold that the defendant was not in custody prior to the time that he gave his confession. There was no seizure of defendant in violation of his Fourth Amendment rights. Defendant voluntarily went to police headquarters in response to a request of the police. *Dunaway v. New York, supra,* 442 U.S. 200, 60 L.Ed. 2d 824 (1979). *See People v. Morales*, 42 N.Y. 2d 129, 366 N.E. 2d 248, 397 N.Y.S. 2d 587 (1977), *cert. denied,* 434 U.S. 1018 (1978). Unlike the defendant in *Dunaway*, Jackson was told he was free to go on the very day he confessed. There was nothing in the conduct of the law enforcement officers during any of the interviews of the defendant which would have indicated to a reasonable person in defendant's position that he had been taken into custody or otherwise deprived of his freedom of action in any significant manner. *Davis, supra.* There was no threatening presence of several officers, no display of weapons, no physical touching of Jackson, no use of language or tone of voice indicating that compliance with the officers' request might be compelled. *United States v. Mendenhall, supra,* 446 U.S. 544, 64 L.Ed. 2d 497 (1980). In fact, he exercised his freedom by leaving the police department at the close of the interviews on 26

and 27 March and being driven by the officers to the destination which he chose. The evidence further indicates that defendant was given water and coffee and was allowed to use the bathroom facilities and that the officers did not deny any request made by him. We cannot say that the confession was obtained in a police dominated atmosphere. The trial court's finding is amply supported by the evidence, and we are therefore compelled to accept it.

Finding of Fact (59):

> That the defendant understood what he was doing in executing the waiver; that he was not under the influence of drugs or alcohol; that he was made no promises nor coerced nor threatened in any way by any person to cause the defendant to waive his rights or to make any statement;

In arguing that this finding of fact is erroneous, the defendant does not contend that the finding is unsupported by the evidence but argues that it is a conclusion of law. A finding by the court that no promises were made to the defendant and that he was not threatened in any way to induce him to make a statement or execute a waiver of counsel is a proper finding of fact. *State v. Stinson*, 297 N.C. 168, 254 S.E. 2d 23 (1979). Although defendant does not contend that this finding is unsupported by competent evidence, a review of the record indicates that it is so supported. Officer Mack testified that no one to his knowledge made any threats or promises to the defendant to induce him to execute a waiver and make a statement to the officers. Officer Parker, to whom Jackson ultimately confessed, testified that he did not threaten Jackson in any way or make any show of physical force towards him during the interview in which Jackson confessed. He also testified that he never promised Mr. Jackson anything or threatened him with anything in order to obtain this statement.

Officer Privette testified as to what he understood Detective Mack indicated to the defendant with respect to promises. Privette said that

> seems like I do recall him saying that, you know, if he would tell the truth about the incident that it would certainly come out in court that he cooperated. But as far as—and that

would help him, couldn't hurt him, something to that effect; may not have been the exact same words.

Officer Privette testified that he told the defendant that it would be best if he would just tell the truth in the long run. He also told him that "we could not promise him anything." That was told to Jackson several times in the interview. Privette also testified that they never told defendant that he was going to benefit from confessing to this crime. They did not tell him he was going to get any particular punishment. Admonitions by officers to a suspect to tell the truth, standing alone, do not render a confession inadmissible. *State v. Dishman,* 249 N.C. 759, 107 S.E. 2d 750 (1959); *State v. Thomas,* 241 N.C. 337, 85 S.E. 2d 300 (1955); *State v. Thompson,* 227 N.C. 19, 40 S.E. 2d 620 (1946). *See State v. Fox,* 274 N.C. 277, 163 S.E. 2d 492 (1968). In *Thompson,* the defendant was told "it would be better to go on and tell us the truth than try to lie about it." We believe that the instant case falls within the language of *Thompson.* The statement attributed to Mack, "it would certainly come out in court that he cooperated," does not provide a basis to hold that Jackson's confession was induced by hope. Any inducement of hope must promise relief from the criminal charge to which the confession relates. *State v. Pruitt, supra,* 286 N.C. 442, 212 S.E. 2d 92 (1975). Such does not appear in the record before us. We hold defendant's confession was not a product of hope or induced by fear. *State v. Rook, supra,* 304 N.C. 201, 283 S.E. 2d 732, *cert. denied,* 455 U.S. 1038 (1982). *See State v. Simpson,* 299 N.C. 335, 261 S.E. 2d 818 (1980). Although not challenged on this basis, we conclude that this finding is supported by competent evidence.

Finding of Fact (60):

That the defendant had voluntarily come to the Investigative Division of the Raleigh Police Department on March 26 and March 27, and April 8, 1981; that he had not been taken into custody nor arrested but was advised fully and completely as required by *MIRANDA* and orally and in writing waived those rights prior to being interviewed; that after the interviews on March 26 and March 27, 1981, the police officers took the defendant to his home and released him;

Again, defendant does not argue that this finding is unsupported by competent evidence but merely asserts in one sentence that it is a conclusion and not a true finding of fact. As discussed in previous exceptions by the defendant, we conclude that the evidence in the record does support this finding.

Finding of Fact (62):

That neither Detective Mack nor Detective Parker made any promises to nor threatened nor coerced this "street-wise" defendant in any way to obtain a statement; that the statement made by the defendant was knowingly, freely, voluntarily, and understandingly made without the slightest hope or fear; see *U.S. v SMITH*, 574 F. 2d 707 [2d Cir., *cert. denied*, 439 U.S. 986] (1978); *U.S. v HARTMAN*, 566 F. 2d 49 [8th Cir. 1977]; *CHANEY v. WAINWRIGHT*, 561 F. 2d 1129 [5th Cir. 1977, *cert. denied*, 443 U.S. 904 (1979)]; *U.S. v GREER*, 566 F. 2d 472 [5th Cir.], cert. denied, 435 US 1009 (1978). See *U.S. v SIKORA*, 635 F. 2d 1175 [6th Cir.] (1980), statements made immediately after DEA Agent informed defendant that governor had enough evidence to convict not involuntary, cert. denied, 449 US 993 (1980), and *U.S. v HART*, 619 F. 2d 325 (4th Circuit, 1980), falsely informing suspect that cooperation 'could have a bearing on bond reduction did not render resulting statement involuntary.'

Defendant objects to the finding that the defendant was "street-wise," arguing that there is no evidence to support such a finding. "Street-wise" is not found in The American Heritage Dictionary of the English Language (1980 edition). However, in today's parlance it is sometimes used to describe a person who has had extensive experience with the criminal law and knows how to deal with the criminal law system. The evidence which indicates that defendant has some significant prior involvement with the criminal law, including serving time in prison and several times being interrogated by the police department, supports this finding that the defendant was in fact street-wise, as that term is sometimes used.

Defendant alleges that findings (63), (64), and (66) are not true findings of fact but are largely discussions of law. This is apparent from a reading of these findings. Defendant does not argue

that these findings are improper or that he was prejudiced in any way by their being erroneously denominated as findings of fact rather than conclusions of law. We find no prejudicial error with respect to these findings.

**[2]** Next, defendant argues that the trial court erred in holding that his constitutional rights, federal or state, were not violated by his interrogation or confession. We do not agree and affirm this ruling by the trial court.

The North Carolina rule and the federal rule for determining the admissibility of a confession is the same. It is a rule or test of voluntariness in which the court looks at the totality of the circumstances of the case in determining whether the confession was voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 36 L.Ed. 2d 854 (1973); *Frazier v. Cupp, supra*, 394 U.S. 731, 22 L.Ed. 2d 684 (1969); *State v. Schneider*, 306 N.C. 351, 293 S.E. 2d 157 (1982); *State v. Booker*, 306 N.C. 302, 293 S.E. 2d 78 (1982); *State v. Davis, supra*, 305 N.C. 400, 290 S.E. 2d 574 (1982). Insofar as the trial court found to the contrary, it is in error.

We turn then to examine the totality of the circumstances of the case as found by the trial judge and above affirmed by this Court. It would serve no useful purpose to set forth again the evidence in this case or the trial court's extensive findings. In brief summary they show: the defendant was never in custody or under arrest before he confessed; he was told by an officer on the day he confessed that he was free to go at any time; he was not restrained, not touched, threatened, or intimidated; he was taken where he wanted to go after the first two sessions with the officers; he walked to the police station one day; there was at least a week between the second and third interviews; defendant had an extensive criminal history and had previous experience with interrogation; Jackson was repeatedly given proper *Miranda* instructions although he was not in custody; the officers attempted to deceive defendant and lied to him about the evidence they had; defendant also made misrepresentations to the officers and was aware to some extent that the officers were not truthful with him; defendant was not questioned for undue periods of time, and no promises or threats were made to him.

The findings of fact, which we have held are supported by the evidence, are binding upon this Court. *State v. Rook, supra*,

304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, 455 U.S. 1038 (1982). The legal significance of the findings of fact made by the trial court is a question of law for this Court to decide. *State v. Davis, supra.* The facts so found support the conclusion that the confession was not constitutionally impermissible. Defendant's only argument arises from the trial court's findings that the officers deceived and lied to the defendant. Such actions are not to be condoned by the courts, but standing alone, as here, they are not sufficient to render defendant's confession inadmissible. *Frazier v. Cupp, supra,* 394 U.S. 731, 22 L.Ed. 2d 684 (1969); *Moore v. Hopper, supra,* 389 F. Supp. 931 (M.D. Ga. 1974), *aff'd,* 523 F. 2d 1053 (5th Cir. 1975); *Roe v. People of State of New York, supra,* 363 F. Supp. 788 (W.D.N.Y. 1973), *aff'd,* 495 F. 2d 764 (2d Cir. 1974); *Sovalik v. State,* 612 P. 2d 1003 (Alaska 1980); *Moore v. State,* 230 Ga. 839, 199 S.E. 2d 243 (1973); *Jacobs v. State,* 133 Ga. App. 812, 212 S.E. 2d 468 (1975); *State v. Booker, supra,* 306 N.C. 302, 293 S.E. 2d 78 (1982). *See generally* 99 A.L.R. 2d 772 (1965); 23 C.J.S. *Criminal Law* § 827 (1961). Deception or trickery is merely one of the circumstances that the court may consider in looking at the totality of the circumstances surrounding the confession. *Booker, supra.*

The other circumstances do not support a conclusion that the confession was involuntary. Defendant was not in custody. He was not deceived or tricked about the nature of the crime involved or the possible punishment. *Carter v. Garrison,* 656 F. 2d 68 (4th Cir. 1981), *cert. denied,* 455 U.S. 952 (1982). His *Miranda* rights were not violated. He was not held incommunicado. *Davis v. North Carolina,* 384 U.S. 737, 16 L.Ed. 2d 895 (1966). He was not subjected to prolonged uninterrupted interrogation. *State v. Morgan,* 299 N.C. 191, 261 S.E. 2d 827, *cert. denied,* 446 U.S. 986 (1980). He was not subjected to physical threats or shows of violence. *Brown v. Mississippi,* 297 U.S. 278, 80 L.Ed. 682 (1936). No promises were made to him in return for his confession. He was experienced in the criminal justice system and was not retarded, feebleminded, or emotionally upset. *Schneckloth v. Bustamonte, supra,* 412 U.S. 218, 36 L.Ed. 2d 854 (1973). Defendant's independent will was not overcome, so as to induce a confession he was not otherwise disposed to make, by mental or psychological coercion or pressure. *State v. Morgan, supra,* 299 N.C. 191, 261 S.E. 2d 827, *cert. denied,* 446 U.S. 986 (1980).

No due process or Fifth Amendment rights, state or federal, of the defendant were violated. We now examine the issue of defendant's Fourth Amendment rights. *Dunaway v. New York, supra,* 442 U.S. 200, 60 L.Ed. 2d 824 (1979), held that taking a person into custody and to the police station for questioning on less than probable cause to arrest violates the Fourth Amendment. Confessions obtained during such detention are inadmissible even though the Fifth Amendment has been complied with, unless there has been a sufficient break in the causal connection between the illegal action and the confession.

Before the principles of *Dunaway* can be applied to a confession, there must be a finding supported by competent evidence that the confessor was, prior to the confession, taken into custody, arrested, or detained by law officers upon less than probable cause to arrest. Here, the officers certainly did not have probable cause to arrest Jackson prior to his confession. *Whiteley v. Warden of Wyoming Penitentiary,* 401 U.S. 560, 28 L.Ed. 2d 306 (1971). The evidence, however, fails to support a finding that Jackson was at any time prior to his confession in custody, under arrest, or that his freedom of action was deprived in any significant way or that he was not free to leave at any time. *United States v. Mendenhall, supra,* 446 U.S. 544, 64 L.Ed. 2d 497 (1980). This issue has been fully considered and determined by the Court in its decision that there is no error in finding of fact (54), *supra.* The United States Supreme Court held in *Mendenhall*:

> We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. . . . In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Id.* at 554-55, 64 L.Ed. 2d at 509-10 (citations omitted). We hold that on the facts of this case, no "seizure" of Jackson occurred within the meaning of the Fourth Amendment. Therefore, the principles of *Dunaway* are not applicable to Jackson's confession. *State v. Morgan, supra,* 299 N.C. 191, 261 S.E. 2d 827, *cert. denied,* 446 U.S. 986 (1980). *Cf. Oregon v. Mathiason, supra,* 429 U.S. 492, 50 L.Ed. 2d 714 (1977).

## STATE'S ASSIGNMENT OF ERROR

[3] The last issue on this appeal is the contention of the state that the trial court applied an improper standard in determining the voluntariness of defendant's confession. We agree and accordingly reverse the decision of the trial court suppressing defendant's confession.

The trial court concluded that defendant's confession was not "attributable to that love of truth which predominates in the breast of every man, not operated upon by other motives more powerful with him," and, therefore, it was not admissible under the decisional law of the Supreme Court of North Carolina. The decision to which the trial court referred is *State v. Roberts,* 12 N.C. 259 (1827). The pertinent parts of that opinion are:

> Confessions are either voluntary or involuntary. They are called voluntary when made neither under the influence of hope or fear, but are attributable to that love of truth which predominates in the breast of every man, not operated upon by other motives more powerful with him, and which, it is said, in the perfectly good man cannot be countervailed. These confessions are the highest evidences of truth, even in cases affecting life. But it is said, and said with truth, that confessions induced by hope or extorted by fear are, of all kinds of evidence, the least to be relied on, and are therefore entirely to be rejected.

*Id.* at 261-62. The above quotation comes from the concurring opinion of Justice Henderson, one member of the three-justice Court. Although portions of Justice Henderson's opinion have been quoted by this Court, it has never been held by this Court that a confession is inadmissible in evidence unless it is "attributable to that love of truth which predominates in the breast of every man." In *State v. Rook, supra,* 304 N.C. 201, 283 S.E. 2d

732 (1981), *cert. denied*, 455 U.S. 1038 (1982), *Roberts* was quoted and relied upon for the holding that a confession obtained by the influence of hope or fear implanted in defendant's mind by the officers is inadmissible. Likewise, in *State v. Pruitt, supra,* 286 N.C. 442, 212 S.E. 2d 92 (1975), this Court again relied upon *Roberts* for its holding that a confession is inadmissible if procured under the influence of hope or fear arising from the words or actions of the officers who held defendant in custody. The reliance of this Court upon *Roberts* in *Rook* and *Pruitt* for the purposes expressed is entirely proper and appropriate. We decline, however, to extend our reliance upon *Roberts* to include the rule adopted by the trial court in this case.

The North Carolina test to determine the admissibility of a confession continues to be whether the confession is voluntary under the totality of the circumstances of the case. *State v. Schneider, supra,* 306 N.C. 351, 293 S.E. 2d 157 (1982); *State v. Booker, supra,* 306 N.C. 302, 293 S.E. 2d 78 (1982); *State v. Davis, supra,* 305 N.C. 400, 290 S.E. 2d 574 (1982); *State v. Morgan, supra,* 299 N.C. 191, 261 S.E. 2d 827, *cert. denied,* 446 U.S. 986 (1980). Under this test, defendant's confession is admissible.

The order of the trial court suppressing the confession of the defendant is

Reversed.

Justice MITCHELL concurring.

I concur in Justice Martin's scholarly opinion for the majority. I hasten to point out, however, that, in my view a different result might well be required *had this defendant been in custody* at the time he confessed.

The defendant has had the benefit of excellent appellate advocacy before this Court. Counsel for the defendant has been diligent in marshaling all or most of the confession cases which have been decided by this Court. Only one of those cases, *State v. Whitfield,* 70 N.C. 356 (1874), dealt with an accused who was not in custody at the time of his confession. That case involved a recently freed slave who was approached in a field in a rural county of this State shortly after obtaining his freedom by his former master and two other white men. Quite probably no per-

son living today can adequately appreciate the coercive effect upon this former slave when he was accused by these three white men of stealing a hog and told he had "better say so." *Whitfield* is, in my view, a unique case having no applicability here.

The trial court's determination that the defendant was not in custody was supported by overwhelming evidence. For me, this fact is decisive. Had it not been established in this case that the defendant was not in custody at the time of his confession, I might well join the dissenters.

Justice Exum dissenting.

The majority's summarization of the facts, while generally adequate, does omit some critical details about defendant's 8 April 1981 interrogation and the events which preceded it. Before 8 April defendant had taken a polygraph, the results of which do not appear in the record. On two separate days, March 26 and 27, several different officers interrogated him for a total of six and three-quarters hours. Officer Mack, the principal interrogator during this period, told defendant bloodstains had been found on his pants and tracks from his tennis shoes were found in the victim's house—neither of which was true.

On 8 April Detective Williams, who was in charge of the investigation, picked defendant up about 5:30 or 6 p.m. and asked him to come to the police station for more questioning. Defendant agreed. Williams did not arrest defendant, but he was taken to an interrogation room in the Investigative Division of the police station.

Before Williams had picked up defendant he had made special arrangements with Detective Parker to aid in the interrogation if necessary. Although Parker was not assigned to the case he was asked to help because in Williams' view, "He is a good interrogator. He comes across well. He knows how to use stuff and when I say 'stuff' I refer to theatrics and this kind of stuff, extremely well."

Williams prepared, at Parker's request, the bloody thumb-print on the knife which resembled the murder weapon and photographs of the prints showing various identification markings. Both Parker and Williams knew no prints or blood had been found on the knife.

After defendant was brought to the interrogation room by Williams he was told Officer Mack, the only black officer involved in the investigation, would be with him shortly. Mack knew defendant before this investigation because he had questioned defendant about an armed robbery and rape at a fast-food restaurant in 1979 and an attempted rape in 1977 or 1978.

Mack, accompanied by Detective Privette, first gave defendant his *Miranda* warnings, orally and with a written form. Mack began the interrogation by going over defendant's previous statements and pointing out discrepancies. The doctored knife was in the room so defendant could see it and at some point Mack asked defendant how he would explain his fingerprints on the knife, even though Mack knew defendant's fingerprints were not on the knife. Mack acknowledged that he encouraged defendant to believe the doctored knife was the murder weapon, and that if defendant "had seen the knife previous to us presenting it to him, I'm sure he would have been frightened by it."

During this interrogation of defendant the officers introduced the specter of the death penalty. Mack told defendant the maximum penalty for a capital case was death. Mack testified:

> I made the statement to Mr. Jackson that if after he was convicted of the death penalty, or if after he received the death penalty in the State of North Carolina, if after, and if he did go to the gas chamber, nobody, after the pill was dropped in the bucket of water, would rush in to save his life.

On redirect-examination Mack more fully set forth what he told defendant about the death penalty:

> I had been talking with Mr. Jackson about this incident and I explained to Mr. Jackson that in North Carolina . . . whether or not he got the death penalty depended on the circumstances under which the crime was committed. I went on to explain to Mr. Jackson that if there were extenuating circumstances, that if he waited until he went into the gas chamber and they dropped the pill in the bucket nobody would rush in to take his statement at that time.

According to Privette, Mack "explained what the death penalty was as far as maximum, minimum, second degree," and Privette

was "pretty sure" he explained parole possibilities. Privette testified:

> I recall, seems like that Detective Mack said something to the effect that if you did kill the girl and you done it by accident, or it wasn't premeditated, or it happened at a rational moment, irrational moment or something to that effect, that the judge and jury should know that, what was going through your mind at the time, not that you premeditated, set there with a knife and went through the house and stabbed her without some other circumstance besides premeditation. I remember that was explained to him.
>
> . . . .
>
> He said if he felt sorry that he did kill the girl, where it was in court or whatever, and he felt like shedding tears, something like that in effect, or before a judge or jury, do so; something to that effect. He didn't tell him to get up and shed tears, Mr. Bass, just to let the jury feel sorry for him, no, if that's what you asked; but he did say something about shedding tears. I believe that's the way you put it.
>
> Q. This conversation concerning the jury and shedding of tears was a means of giving the defendant some hope, would that be fair?
>
> A. Hope for what?
>
> Q. Hope for himself, his future, his life?
>
> A. If it meant let him feel better, that's the way I took it, I guess that's what Gerald meant by telling him that. No, I don't think that was the occasion, Mr. Bass.
>
> Q. It gave him hope to avoid the death penalty?
>
> A. It might would have, I don't know.

Mack told defendant "that he had friends in that room at that time," when the only people in the room were the officers and defendant. Mack also asked defendant how he could be so calm in the interview room. Mack talked with him about lying to the officers in the interview room. At some point near the end of the interrogation he told defendant he thought he was lying. Mack also admitted telling defendant, "James, we have a witness who saw

you running out of that house on Cox Avenue," even though he knew there was no such witness. Mack further admitted telling defendant "that the jurors were people just like him and me; that they were sensitive to his disposition in court; that if he acted more less a macho man, many people would be turned off by that and I told him that he could learn to use the emotions of people even in a situation like this." Mack responded to the following question in the manner set forth:

Q. You talked about working on emotions, emotions to a jury, and this type of interview on your part was intended to work on his emotions, is that correct?

A. This part of the interview was, I guess you could say that.

Mack testified he told defendant he thought his girlfriend was pregnant. He told defendant he thought "he was not capable of making any babies." He informed defendant "that if indeed his girlfriend was pregnant, if he were convicted of the offense which we were talking about, that in all probablility it would be unlikely that he would be the one to raise his child."

Both Mack and Privette acknowledged they told defendant they believed he was guilty of the crime. Privette said he told defendant it was "very easy to tell he was lying about it . . . . I told him it would be best if he would just tell the truth in the long run." Privette recalled Mack telling defendant, "If he would tell the truth about the incident that it would certainly come out in court that he cooperated."

After Mack and Privette finished questioning defendant at 10 p.m. Officer Parker took over. When Officer Parker went in to interrogate defendant he had two photographs, a cassette tape recorder and two cups of ice water. Parker told defendant it was his "job to examine the physical evidence and go over the physical evidence that would be presented to the court by officers involved in the investigation." He said he "was not directly involved in the investigation," but he wanted to go over the available physical evidence with defendant. Parker related how the FBI had used a laser beam to obtain defendant's fingerprint from the murder weapon. He then showed defendant the photographs and explained the identification markings. Parker testified:

I said [to defendant] it is evident we have your finger-prints. I said you can go into court and say they're not your fingerprints and I can go into court and be my job to prove that they are your fingerprints. I said now if you have a logical reason for having your fingerprints on the murder weapon, then you can tell me and I can relay it to the court as to why your fingerprints were on that weapon.

Parker asked defendant if he had lied to Mack. Defendant said he had, so Parker left about 10:20 p.m. and Mack reentered. During this session defendant admitted touching the knife but denied killing the victim.

At 11:15 p.m. Mack left and Parker came back in, bringing coffee for defendant and himself. Parker reviewed the evidence for defendant:

I told him that we had a murder weapon; that it was evident that we had his fingerprints. I told him that we had his fingerprints on a knife sharpener which was found inside the residence where the homicide took place. I told him that we had a fingerprint on a wooden post on the front porch that was his fingerprint; and I asked him if he saw the composite sketch that was put in the newspapers and he replied that he did. I asked him how he thought we got the composite sketch. He said he did not know. I said we have a female eyewitness that saw you coming out the door carrying the knife in your hand. I said now this is the evidence that we are going to present to the court. I said you can go into court and say no, it's not me, or we can go into court and say it is.

Parker also testified that during the final part of the discussion he told defendant that "he would go into court and plead not guilty and if he did that then the other officers would probably go into court and testify that he was a black man out here viciously raping and killing white women and I did not feel that that was the case, and if he wanted to tell me his side of it that I would listen to him." Finally, Parker told defendant he believed he had committed the murder.

After Parker told defendant he would listen to him defendant said, "[O]kay, I'll tell you I did it." Parker proceeded to have

defendant write his confession. He began writing about 11:55 p.m., approximately six hours after the questioning began.

All of the foregoing testimony was elicited from the officers themselves. Defendant's testimony is generally consistent with the officers'.

Defendant testified he was twenty-two years old and had attended the tenth grade at Broughton High School. Although defendant had been questioned by Officer Mack about other, more serious, offenses, he only had been convicted of possession of stolen property, breaking and entering and simple assault and had served thirteen months in prison. He was released on parole in September 1980.

Defendant admitted that he gave the officers the wrong tennis shoes and pants but the correct shirt when asked for them on 26 March. He also acknowledged the officers advised him of his rights at the start of every interrogation. But this "street-wise" defendant, as the trial court and the majority characterize him, never asked for an attorney, never refused to answer questions, and agreed to take a polygraph test. The officers stated defendant never asked for food or drink, although he accepted coffee and water when it was offered. The officers also testified defendant never asked to leave; defendant testified he tried to leave a few times but Officers Williams and Mack stopped him. He said he was not told he could leave when he wanted to.

His testimony about what was said and done differed from the officers primarily in the following significant respects. Defendant testified that he was scared and frightened during the interrogation but he tried to appear calm because he did not want the officers to know he was frightened.

During his first interrogation by Detective Beasley on 26 March Beasley threatened defendant with his fist and called him a "f_____ murderer." Beasley denied any show of physical force but did admit he told defendant several times he believed defendant had killed the girl although he denied using the exact phrase defendant recalled.

Defendant said the officers told him the only way he could keep from going to death row was by making a statement. He also testified Officer Privette suggested to him during the second

session with Mack and Privette on 8 April that he say he met the victim in Pullen Park. Defendant said Mack told him his state-appointed attorney would not care whether he won or lost his case because the attorney would be paid irrespective. Parker told him there was a warrant waiting for him when he walked out the room if he did not make a statement to help himself in front of the jury. Mack also told him they would not accept a plea bargain if he did not make a statement. Defendant said Parker told him he had witnesses on tape who saw him leave the victim's house. Finally, in an unusual twist, defendant testified he did not recall Parker's statement about officers testifying that he was viciously raping white women, which Parker had already admitted he made.

From the acts and declarations of the interrogating officers as revealed by their own testimony, it should be clear that the majority's categorical conclusion that no promises or threats were made to defendant is simply wrong. The conclusion seems to be based either on the proposition that promises or threats must be express rather that implied, inferred or suggested, or on the proposition that the trial court's finding that none were made is binding on this Court. Neither proposition is true. "[W]hether the conduct and language of the investigating officers amounted to such threats or promises or influenced the defendant by hope and fear as to render the subsequent confession involuntary is a question of law . . . reviewable on appeal." *State v. Rook,* 304 N.C. 201, 216, 283 S.E. 2d 732, 742 (1981), *cert. denied,* 455 U.S. 1038 (1982); *accord, State v. Pruitt,* 286 N.C. 442, 212 S.E. 2d 92 (1975). Threats may be inferred from statements tending to provoke fright and promises may be implied from statements suggesting some hope. *State v. Pruitt, supra; State v. Fox,* 274 N.C. 277, 163 S.E. 2d 492 (1968). *Pruitt* and *Fox* and the cases they cite make it abundantly clear that if the language and conduct of interrogating officers suggests or implies some hope as a consequence of confessing or if it tends to provoke fright as a consequence of not confessing, the resulting confession is involuntary and inadmissible as a matter of law. These cases and *Rook* also make it clear that whether the language and conduct have these effects is a question of law determinable after review of all the circumstances surrounding the confession. Indeed, the inadmissibility of this con-

fession is dictated by the principles set out in and the holdings of *Pruitt* and *Fox.*

*State v. Pruitt, supra,* an opinion for a unanimous Court by Justice, now Chief Justice, Branch, accurately summarizes our law governing admissibility of confessions and carefully applies that law to facts similar to those at bar resulting in the exclusion of the *Pruitt* confession. Indeed, when the proper legal principles are applied, the facts before us are more compelling for exclusion than those in *Pruitt.*

Pruitt had confessed to entering the residence of neighbors and friends, the Donlins, at approximately 4 a.m. The residence was occupied by Mrs. Donlin (Chris) and the Donlins' two children, Patricia, aged 7, and Jeremiah, aged 4. During a quarrel with Chris defendant said he choked her and beat her with the stock of a rifle. He then choked the children, set the house on fire and left. Other evidence in the case tended to show that the children were burned to death but that Chris Donlin died from "trauma to the head." In addition to Pruitt's confession, the state offered evidence tending to link him to the crimes of arson and murder: Defendant at the scene of the fire was asked whether people were still inside the residence. He replied, "She's in there on the couch. She's been raped and cut open and they've set her house on fire." 286 N.C. at 443, 212 S.E. 2d at 94. A search of Pruitt's residence revealed army fatigues in the closet of a rear bedroom with bloodstains on the jacket and pants. Further, in a conversation with a bailiff in district court defendant was told that he could not get his clothes because his house had burned down. Defendant replied, "No, that house belonged to the woman that I killed." *Id.* at 446, 212 S.E. 2d at 95.

The principal question in *Pruitt* was the admissibility of his confession. On *voir dire* at trial to determine its admissibility only the state offered evidence. This evidence tended to show that Pruitt was taken to the sheriff's interrogation room where he was questioned for 15 to 20 minutes by Lt. Smith, Sgt. Conerly, and Officer Martin. He was given full *Miranda* [*v. Arizona,* 384 U.S. 436 (1966)] warnings and waived in writing his right to counsel and his right to remain silent. This written waiver also contained statements by Pruitt that no one had made promises or threats to him to get him to make a statement and that his statement was

given voluntarily of his own free will. 286 N.C. 450, 212 S.E. 2d at 98. Sgt. Conerly testified that after defendant signed a waiver the officers told him about the bloody fatigues, the discrepancies in his previous statements, and that there were "too many holes in his story." They told him that in their opinion "he had done it," that he was lying and that *it would be better for him to just go ahead and get it off his chest.*" Conerly said, *"I possibly told him that he would be making it harder on himself by not making a statement,"* and that he did tell Pruitt *"that it would simply be harder on him if he didn't go ahead and cooperate." Id.* at 451-52, 212 S.E. 2d at 98-99 (emphasis original). After voir dire the trial judge found that no threats or promises were made to Pruitt and that his statement was voluntarily and knowingly made without inducement or coercion.

This Court reversed and concluded that Pruitt's confession was inadmissible. The Court carefully outlined the law governing admissibility of confessions when *Miranda* warnings have been given as follows: The question for decision is whether the confession was "voluntarily and understandingly made. The answer to this question must be found from a consideration of the entire record." *Id.* at 454, 212 S.E. 2d at 100. Confessions made under the "influence of hope or fear and implanted in defendant's mind by the acts and statements of" the officers interrogating him are involuntary and inadmissible. *Id.* at 455, 212 S.E. 2d at 100. Whether the conduct and language of the interrogating officers amount to promises or threats so as to make the confession involuntary is a question of law fully reviewable on appeal. *Id.* at 454, 212 S.E. 2d at 100.

The Court in *Pruitt* then reviewed the holdings of our leading confession cases. In *State v. Roberts*, 12 N.C. 259 (1827), a confession was held inadmissible as being involuntary when the accused was told that since he was in custody any confession he would make could not be used against him at trial and that it would be to his credit to confess. In *State v. Whitfield*, 70 N.C. 356 (1874), the accused, a Negro, was confronted by his white employer who told the accused that a hog had been stolen and said, "I believe you're guilty; if you are, you had better say so; if you are not, you had better say that." *Id.* at 356. Defendant's immediate confession to the theft was held to be involuntary and inadmissible. In *State v. Stevenson*, 212 N.C. 648, 194 S.E. 81 (1937),

defendant was told by an officer, "There is no use you beginning to tell a lie to me this morning, I have already got too much evidence to convict you." *Id.* at 649, 194 S.E. at 81. Defendant confessed and the Court on appeal concluded that the confession was involuntary and inadmissible. *Id.* at 650, 194 S.E. at 82. The Court in *Pruitt* then reviewed cases in which interrogating officers had told defendants that it would be "easier" or "lighter" on them if they confessed; that it would "be better for him in court if he told the truth"; that the officers would be able to testify that defendants "cooperated if they aided the State in its case"; and that the officers "would try to help defendant." In each of these cases confessions made subsequent to such overtures were held involuntary and inadmissible. 286 N.C. at 457-58, 212 S.E. 2d at 102. The Court in *Pruitt* carefully noted that admonitions to an accused "to tell the truth, standing alone, do not render a confession inadmissible." 286 N.C. at 458, 212 S.E. 2d at 102. But suggestions that it would be better for defendant in court, or easier on him, or that the officers could help him if he confessed, render confessions involuntary and inadmissible.

Applying these cases and principles to the facts before it, the Court in *Pruitt* concluded as follows:

> In instant case the interrogation of defendant by three police officers took place in a police-dominated atmosphere. Against this background the officers repeatedly told defendant that they knew that he had committed the crime and that his story had too many holes in it; that he was 'lying' and that they did not want to 'fool around.' Under these circumstances one can infer that the language used by the officers tended to provoke fright. This language was then tempered by statements that the officers considered defendant the type of person 'that such a thing would prey heavily upon' and that he would be 'relieved to get it off his chest.' This somewhat flattering language was capped by the statement that 'it would simply be harder on him if he didn't go ahead and cooperate.' Certainly the latter statement would imply a suggestion of hope that things would be better for defendant if he would cooperate, *i.e.*, confess.

286 N.C. at 458, 212 S.E. 2d at 102.

In *State v. Fox, supra,* 274 N.C. 277, 163 S.E. 2d 492, inter-rogating officers told the accused "that he would be a lot better off in court if he would tell them the truth about what happened. . . . [H]e would probably be charged with accessory to murder." In addition the officers showed defendant certain incriminating evidence "to let him know that they 'knew what had happened' and asked him 'if he wanted to give a confession.' " Defendant said that if he confessed, one of his accomplices would kill him. The officer said he would protect the accused from his accomplice "if he would just tell the truth about it." *Id.* at 284, 163 S.E. 2d at 497. Defendant confessed. This Court, speaking through Justice, later Chief Justice, Sharp, concluded that the confession was inadmissible because it was involuntary. The Court reviewed the applicable law as follows:

> When an investigating officer 'offers some suggestion of hope or fear . . . to one suspected of crime and thereby induces a statement in the nature of a confession, the decisions are at one in adjudging such statement to be involuntary in law, and hence incompetent as evidence. . . . (Citations omitted.) *State v. Biggs,* 224 N.C. 23, 26-27, 29 S.E. 2d 121, 123. Whether conduct on the part of investigating officers amounts to a threat or promise which will render a subsequent confession involuntary and incompetent is a question of law, and the decision of the trial judge is reviewable upon appeal. *State v. Biggs, supra.*

> . . . .

> Where the officers merely ask for the truth and hold out no hope of a lighter punishment a defendant's confession is not rendered involuntary by their request for 'nothing but the truth.' *State v. Thomas,* 241 N.C. 337, 85 S.E. 2d 300; *State v. Thompson,* 227 N.C. 19, 40 S.E. 2d 620; 23 C.J.S., Criminal Law § 817(8) (1961). In *State v. Dishman,* 249 N.C. 759, 107 S.E 2d 750, the officers told defendant that 'it would be better if he would go ahead and tell (them) what had happened.' Nothing else was said. The court's conclusion that the defendant's confession was voluntary was upheld. In *State v. Fuqua,* 269 N.C. 223, 152 S.E. 2d 68, however, the officer testified that he told the defendant 'if he wanted to talk to me then I would be able to testify that he talked to me and

was cooperative.' We held that "[t]his statement by a person in authority was a promise which gave defendant a hope for lighter punishment"; that therefore the defendant's confession was involuntary and incompetent as a matter of law. *Id.* at 228, 152 S.E. 2d at 72.

Here, the implication of Officer Cunningham's statement to McMahan was (1) if he told the truth about the entire matter it would be better for him in court and (2) he might be charged with a lesser offense. Clearly this statement constituted 'a suggestion of hope' which rendered his subsequent confessions involuntary.

274 N.C. at 292-93, 163 S.E. 2d at 502-03.

It is true that Pruitt and the defendant in *Fox* had been formally arrested at the time they confessed, while defendant here had not. This fact is insufficient to distinguish *Pruitt* and *Fox.* First, it was a fact not much relied on in either case. Rather, the *Pruitt* Court found it important that the interrogation "took place in a police dominated atmosphere," 286 N.C. at 458, 212 S.E. 2d at 102, as did the interrogation of defendant here. The Court in *Fox* relied solely on the "suggestion[s] of hope." 274 N.C. at 293, 163 S.E. 2d at 503. Second, while Pruitt was questioned only for 15 or 20 minutes, and defendant in *Fox* for a similarly short time, defendant's interrogation on 8 April continued for some six hours. Third, there are further facts here which were not present in *Pruitt* or *Fox.* The officers misrepresented the evidence available to them; impliedly threatened to make defendant's crime appear worse than it was; and implied that if defendant cooperated by confessing to extenuating circumstances he might save himself from the gas chamber. These facts more than make up for the absence of a formal arrest of defendant. Finally, as I shall show below, defendant was in custody, if not under formal arrest, at the time he confessed.

In the case before us the officers admitted telling defendant, among other things: (1) The officers were his friends; (2) no one could help him after he was placed in the gas chamber; (3) if his girlfriend was bearing his child he would not be the one to raise it if he were convicted; (4) that if there were extenuating circumstances, defendant should "bring [them] to light" or otherwise risk suffering the death penalty; (5) defendant might avoid the

death penalty by playing on the jurors' emotions at trial; (6) the detectives would offer in court against him the evidence that defendant's fingerprints were on the murder weapon and at various places at the crime scene [all of which was fabricated]; (7) if defendant pled not guilty the officers "would probably go into court and testify that he was a black man out there viciously raping and killing white women"; (8) they believed defendant committed the murder and accused him of lying and of killing the victim; and (9) if he told the truth "it would certainly come out in court that he cooperated." Surely, "one can infer that the language used by the officers tended to provoke fright" and at least implied "a suggestion of hope that things would be better for defendant if he would cooperate, i.e., confess" within the ambit of the language and holdings in *Pruitt* and *Fox*.

As the Court in *Pruitt* said, "The facts of this case disclose the commission of [a] brutal and revolting [crime]. Yet, we must apply well-recognized rules of law impartially to easy and hard cases alike lest we make bad law which will erode constitutional safeguards jealously guarded by this Court for nearly a century and a half." 286 N.C. at 458-59, 212 S.E. 2d at 103. So it should be here. As we held the confession in *Pruitt* should have been suppressed, so we ought to hold here.

Two other cases decided by this Court reinforce the dictates of *Pruitt* and *Fox*:

In *State v. Stephens*, 300 N.C. 321, 266 S.E. 2d 588 (1980), in an opinion by Justice Huskins, the Court held: "If the totality of circumstances indicates that defendant was threatened, *tricked*, or cajoled into a waiver of his rights, his statements are rendered involuntary as a matter of law." 300 N.C. at 327, 266 S.E. 2d at 592 (emphasis original). Both defendant Stephens and his counsel were present in the SBI office in Raleigh for the purpose of defendant's taking a polygraph examination. An SBI agent advised defendant and counsel that counsel could not be present during the polygraph examination but that he could be present during the subsequent interrogation of defendant. The investigators, however, began interrogating defendant after they had given him the polygraph test without notifying his attorney who was waiting outside or defendant that the testing portion had been completed and his attorney could be admitted. Defend-

ant made an incriminating statement during the interrogation. The Court held that his statement was involuntary because "the totality of circumstances indicates that, in effect, defendant was tricked or cajoled into waiving his right to counsel and his privilege against self-incrimination. Absent a knowing and intelligent waiver of these rights, defendant's statements cannot be considered to have been voluntarily made." 300 N.C. at 327, 266 S.E. 2d at 592.

In *State v. Anderson*, 208 N.C. 771, 182 S.E. 643 (1935), defendant had confessed to the crime after being told by his interrogator that some of his accomplices had talked "and he might as well do likewise." The interrogator also "told him it would be better for him to go ahead and tell it just like it was and he might as well go ahead and tell it because it was already told." *Id.* at 780, 182 S.E. at 648-49. The truth was that defendant's accomplices had not talked. This Court, in an opinion by former Chief Justice Stacy, concluded that defendant's confession should not have been admitted against him because his interrogator's statements rendered it involuntary. *Id.* at 783, 182 S.E. at 650.

Thus the majority wrongly adopts for this jurisdiction what it perceives to be the general rule in other jurisdictions that trickery, deception and false statements by police officers, while not commendable, do not standing alone render a confession involuntary, unless they are likely to produce an unreliable confession. Until today this has not been the law in North Carolina. Trickery in *State v. Stephens, supra*, and false statements in *State v. Anderson, supra*, were held to be sufficient in and of themselves to render the resulting confession involuntary.

Even the "general rule" which the majority now adopts has no application to this case. For here the officers utilized not only deception, false statements, and fabricated evidence, they also used threats and promises tending to suggest hope and provoke fear in the defendant. Even courts that apply the general rule recognize that deception coupled with such promises or threats render the confession involuntary. *United States ex rel. Everett v. Murphy*, 329 F. 2d 68, 70 (2d Cir.), *cert. denied*, 377 U.S. 967 (1964); *Lewis v. United States*, 74 F. 2d 173, 177 (9th Cir. 1934); *Commonwealth v. Meehan*, 377 Mass. 552, 387 N.E. 2d 527, *cert. granted*, 444 U.S. 824 (1979), *cert. dismissed as improvidently granted*, 445 U.S. 39 (1980) (per curiam). *See generally* Annot.,

"Admissibility of Confession as Affected by its Inducement Through Artifice, Deception, Trickery, or Fraud," 99 A.L.R. 2d 772 (1965), and Later Case Service.

Neither can it be seriously questioned that the officers' implications of hope and provocations of fear coupled with misrepresentations of fact resulted in a confession of sorts from the defendant. The officers told defendant that: (1) they had enough evidence to convict him of first degree murder and they were prepared to introduce it into court against him; (2) first degree murder carried the death penalty unless there were extenuating circumstances; and (3) if there were extenuating circumstances it would be best for defendant to tell about them now since no one would hear about them after he entered the gas chamber. Defendant then "confessed" precisely along the lines the officers suggested would be in his best interest. He admitted the murder but said, incredibly, that the victim, a recently married woman, had invited him into her home and had invited him to have intimate sexual contact with her. When he proceeded to accept her invitations, she began to scream. Becoming frightened and in a state of panic, he killed her. Even the trial judge noted the improbability of the truthfulness of defendant's confession. Indeed, it was because the trial judge concluded that defendant's confession was not motivated by a desire to tell the truth that he ordered it suppressed.

Absent torture or other physical abuse, it would be difficult to conceive of interrogation tactics more likely to produce an untruthful, unreliable confession than the ones utilized in this case. Indeed, according to the findings of the trial judge they in fact produced such an untruthful confession. Therefore even under the general rule adopted by the majority, this confession should have been suppressed, as the trial court correctly ruled.

On the question of whether defendant was in custody, although not under formal arrest, at the time he confessed, the majority has enunciated the proper test, but has not correctly applied it to the facts. As the majority states, "The test to determine custody is whether a reasonable person in the suspect's position would believe himself to be in custody or that his freedom of action was deprived in some significant manner." The majority then states, "The evidence in this case clearly indicates that had

the defendant chosen to get up and leave the detective offices at the time he gave his confession, rather than stay and make that confession, the officers would not have hindered his departure." This statement may be true if considered from the standpoint of the officers who knew that, without a confession, they had no case against defendant. Viewed however from the standpoint of a reasonable person in defendant's position, as the test of custody requires us to do, it is clear that defendant could not have believed he was free to go. For at the time he confessed he had been told the officers had rather overwhelming evidence of his guilt — more than enough to give them probable cause to arrest him. He had been told, albeit falsely, that his fingerprints were on the murder weapon, the victim's knife sharpener and in other places in the deceased's dwelling. He had also been told that a witness had seen him running from the dwelling carrying the knife. So confronted, a reasonable person in defendant's position would have believed that he would not be allowed to leave. Thus defendant at the time of his confession was in custody. Had no *Miranda* warnings been given this defendant, I am satisfied this Court would have held the confessions inadmissible on that account. Yet the warnings are required only in *custodial* interrogations.

The majority seems to rely unduly on the trial judge's finding that defendant was "street-wise" and having first made misrepresentations to the officers regarding his clothing, must have been aware that the officers were making similar misrepresentations to him. I concede the facts support the trial judge's finding that defendant knew the officers were lying to him about the bloodstains found on his clothing and his tennis shoe tracks in the dwelling, since defendant acknowledged these were not the clothes he wore on the night in question. Even so, there is no evidence nor any finding by the trial court that defendant knew that evidence concerning his fingerprints and the witness who observed him was fabricated. Indeed, if defendant had known that this evidence was fabricated, the case for an involuntary confession is made even stronger. For defendant is then in the position of being told by the officers that they intend to use fabricated evidence in court to prove his guilt. This constitutes a threat of the very worst sort having a strong tendency to provoke the kind of fear which renders a subsequent confession involuntary. This is especially true when statements about the fabricated evidence

are coupled with other statements indicating that if defendant confesses to certain extenuating circumstances, he might not get the death penalty. Defendant is placed in this position: If he confesses to a murder with extenuating circumstaces he may be spared the death penalty. If he refuses to confess the officers are prepared to offer fabricated evidence and to testify falsely that he, a black man, not only murdered but raped the white victim to insure both defendant's conviction of first degree murder and his sentence to death.

Finally, even if, as the majority concludes, defendant's confession is reliable under all the circumstances, the methods of interrogation utilized are so fundamentally unfair as to deny defendant due process of law under the rationales, if not the holdings, of a number of United States Supreme Court decisions, not the least of which in *Miranda v. Arizona,* 384 U.S. 436 (1966). *See also, e.g., Mincey v. Arizona,* 437 U.S. 385 (1978); *Davis v. North Carolina,* 384 U.S. 737 (1966); *Lynumn v. Illinois,* 372 U.S. 528 (1963); *Townsend v. Sain,* 372 U.S. 293 (1963); *Culombe v. Connecticut,* 367 U.S. 568 (1961); *Rogers v. Richmond,* 365 U.S. 534 (1961); *Blackburn v. Alabama,* 361 U.S. 199 (1960); *Spano v. New York,* 360 U.S. 315 (1959). *Miranda* is significant because in it the Court adopted certain prophylactic rules which must be followed in every custodial interrogation. These rules were developed with the hope that they would preclude the kind of psychological coercion which the *Miranda* Court found to be widely practiced by police interrogators and of which the Court was highly critical. Many of the practices criticized by the Court were drawn from Inbau and Reid, Criminal Interrogation and Confessions (1962).[1]

---

1. When Inbau and Reid prepared their first edition of this manual for police interrogators, Inbau was Director and Reid was a staff member of the Chicago Police Scientific Crime Detection Laboratory. At the time of the 1967 edition of this work, which was prepared largely as a response to *Miranda,* Inbau was a professor of law at Northwestern University and Reid a director of John E. Reid and Associates. I think it unfortunate that the trial court and the majority place such reliance on this book. Although the book has a section on the law governing the admissibility of confessions, the greater part of the book is nothing more than a police manual suggesting methods of interrogation. Neither the trial court nor the majority indicate upon which aspect of the book they rely. The truth is that the Supreme Court in *Miranda* was critical of some of the methods suggested by Inbau and Reid, 384 U.S.at 448-56, and Inbau and Reid are equally critical in their latest version of the *Miranda* decision, Inbau and Reid, Criminal Interrogation and Confessions, 1-3 (2d ed. 1967). We, of course, are bound by *Miranda.*

I vote to affirm the trial court.

Chief Justice BRANCH and Justice FRYE join in this dissent.