STATE OF NORTH CAROLINA v. JOHNNY WAYNE HYDE

No. 529A98

(Filed 16 June 2000)

**1. Witnesses— sequestration—denial**

A first-degree murder defendant did not show abuse of discretion in the trial court's denial of defendant's motion to sequester witnesses. Furthermore, claims that denial of sequestration violated defendant's constitutional rights were not made at trial and will not be considered on appeal.

**2. Confessions and Incriminating Statements— voluntariness—promises and threats**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion to suppress his inculpatory statements where the court's findings that no promises, threats, or suggestions of violence were made to induce defendant to make a statement or to give permission to the State to obtain a shirt with a bloodstain were amply supported by competent evidence and the court's conclusion that defendant's statements were voluntary was supported by the findings.

**3. Jury— selection—oath**

The trial court did not err by not requiring prospective jurors to swear to tell the truth during jury voir dire. The jurors were properly sworn pursuant to N.C.G.S. § 9-14, an oath of truthfulness is not statutorily mandated, and defendant did not request the oath nor object to its absence during voir dire.

**4. Jury— selection—procedure**

The trial court did not abuse its discretion during jury selection for a capital first-degree murder prosecution in the proce-

dure followed for calling replacement jurors following excusals. Defendant specifically requested or consented to any deviation from the prescribed statutory procedure and concedes on appeal that the court's jury selection method did not disadvantage or prejudice him.

### 5. Jury— selection—sequestration

The trial court did not abuse its discretion by refusing to sequester the jury pool during jury selection for a first-degree murder prosecution where defendant noted that one prospective juror stated that he would give a witness less credibility since he knew the witness and another had stated that defense counsel had "misrepresented" her former son-in-law. Defendant did not assert any constitutional basis for his motion in trial court and admitted in his brief that the only damage from the comments was obvious. Taken to its logical conclusion, defendant's argument would require individual voir dire in every capital case to avoid the potential of a prospective juror saying something unexpected.

### 6. Appeal and Error— preservation of issues—constitutional issues—jury selection

The defendant in a capital first-degree murder prosecution did not object at trial and preserve for appeal the question of whether the jury selection procedure prescribed in N.C.G.S. § 15A- 1214(d) through (f) is unconstitutional since it allows a prosecutor a greater number of prospective jurors from which to choose than it allows defendant.

### 7. Jury— selection—excusals prior to trial

The trial court did not err in a first-degree murder prosecution by excusing, deferring, or disqualifying several prospective jurors prior to defendant's case being called for trial. Assuming that the court failed to comply with N.C.G.S. § 9-6(a) strictly, defendant is not entitled to a new trial absent a showing of corrupt intent, discrimination or irregularities which affected the actions of the jurors actually drawn and summoned. Finally, defendant had no right to be present during the preliminary qualification of prospective jurors since the jurors were excused before defendant's trial began.

**8. Jury— selection—capital trial—ability to consider life sentence**

A first-degree murder defendant who did not exhaust all of his peremptory challenges could not demonstrate prejudice from the trial court's rulings on his questions about prospective jurors' abilities to consider a life sentence.

**9. Evidence— photographs—homicide victim and crime scene**

The trial court did not err in a first-degree murder prosecution by admitting fifty-one photographs of the crime scene, the victim, and the autopsy. Although numerous, the photographs were unique in subject matter and in detail and were relevant and probative in that they corroborated defendant's confession and illustrated the medical examiner's testimony. It cannot be said that the trial court's decision to admit the photographs was so arbitrary that it could not be supported by reason.

**10. Sentencing— capital—aggravating circumstance—avoiding arrest**

The trial court in a capital sentencing proceeding properly submitted the aggravating circumstance that the murder was committed to avoid lawful arrest, N.C.G.S. § 15A-2000(e)(4), where the murder was committed during a burglary and defendant told authorities that he killed the victim because he thought the victim would tell the next day.

**11. Sentencing— capital—prosecutor's argument—killing committed in victim's home**

There was no plain error in a capital sentencing proceeding where the prosecutor argued that the victim was killed in his own home. The killing occurred while defendant and others were engaged in a first-degree burglary, requiring submission of the aggravating circumstance that the killing occurred in the commission of burglary, and the argument served to inform the jury about this aggravating circumstance. This argument did not compel the imposition of the death penalty upon a circumstance not listed in N.C.G.S. § 15A-2000(e).

**12. Sentencing— capital—instructions—weight to be given mitigating circumstances**

The trial court did not err in a capital sentencing proceeding by denying defendant's requested instruction that statutory mitigating circumstances have value or in the instructions given on

the distinction between statutory and nonstatutory mitigating circumstances. Defendant's argument that the jury may not have fully understood that statutory mitigating circumstances have mitigating value as a matter of law has been rejected in other cases. The instructions given here required the jury to give weight to any found mitigating circumstances and were consistent with the pattern jury instructions.

### 13. Sentencing— capital—death penalty—arbitrariness

The record in a capital sentencing proceeding fully supported the aggravating circumstances found by the jury and there was no suggestion that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary consideration.

### 14. Sentencing— capital—death penalty—proportionate

A death sentence was proportionate where defendant killed a defenseless victim in his home and was convicted of both felony murder and premeditated and deliberate murder. This case is more similar to cases where death was found proportionate than to those where it was found disproportionate or to those in which juries have consistently recommended life imprisonment.

Justice WAINWRIGHT did not participate in the consideration or decision of this case.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Wainwright, J., on 23 July 1998 in Superior Court, Onslow County, upon a jury verdict finding defendant guilty of first-degree murder. On 21 April 1999, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 14 March 2000.

*Michael F. Easley, Attorney General, by William N. Farrell, Jr., Senior Deputy Attorney General, for the State.*

*Elizabeth G. McCrodden for defendant-appellant.*

PARKER, Justice.

Defendant Johnny Wayne Hyde was indicted for one count each of first-degree murder; first-degree burglary; robbery with a dangerous weapon; and conspiracy to commit first-degree murder, first-degree burglary, and robbery with a dangerous weapon. He was tried for first-degree murder, first-degree burglary, robbery with a danger-

ous weapon, and conspiracy to commit first-degree burglary at the 6 July 1998 Criminal Session of Superior Court, Onslow County. Defendant was found guilty of first-degree murder on the basis of premeditation and deliberation and under the felony-murder rule, first-degree burglary, and conspiracy to commit first-degree burglary; he was found not guilty of robbery with a dangerous weapon. Upon the jury's recommendation following a capital sentencing proceeding, the trial court, on 23 July 1998, sentenced defendant to death for the murder; the trial court also sentenced defendant to consecutive terms of 77 to 102 months' imprisonment for first-degree burglary and 29 to 44 months' imprisonment for conspiracy to commit first-degree burglary.

Based on defendant's statement to Onslow County Sheriff's Detective W. Len Condry and Onslow County Sheriff Ed Brown, the State's evidence tended to show that on the night of 1 August 1996, defendant was drinking with James Blake and Joel Coleman at a shed next to defendant's house. Defendant heard Blake and Coleman discussing where they could obtain other drugs since the blue pills that they were ingesting were not intoxicating enough. Blake and Coleman mentioned that Leslie Egbert Howard, the victim, always had drugs in his residence. Defendant then listened as Blake and Coleman planned the break-in of the victim's mobile home; the victim was considered an easy target since he was always alone. Sometime after midnight, Blake and Coleman asked defendant for his assistance in breaking into the victim's residence to steal "weed." Defendant agreed, and they gathered several items from defendant's shed. Blake and Coleman dressed in camouflage-style coats, gloves, and toboggans. Defendant carried a knife and a hand saw, while Blake carried an ax head and a pipe.

Defendant, Blake, and Coleman then walked to the victim's mobile home. Blake used the ax head and pipe to pry open the front door. Defendant led the way down the hallway to the victim's bedroom and found the victim sitting up in the bed. The victim then lunged at defendant, and defendant stabbed the victim several times with the knife. When the victim fell to his knees, either Blake or Coleman hit the victim in the back of the head with the pipe. The victim then fell to the floor on his back. Defendant stabbed the victim in the side and in the back with a drill bit from the shed. Defendant then began cutting the victim's throat with the hand saw until the sight of blood and the foul smell became nauseating. Sheriff Brown asked defendant about his intention when he used the saw. Defendant

replied, "I guess to kill him. I guess we thought he would tell the next day if we didn't after all we did." Defendant further stated, "I went over there that night just to be the muscle to help them get the herb. I had no intention of killing [the victim] when we went over there." Coleman resumed cutting the victim's throat for about three minutes while Blake was in the living room keeping a lookout. Someone then yelled that a car was approaching, and then all three men ran from the victim's mobile home back to defendant's shed. Blake set fire to all the weapons in a barrel to "burn off the blood" and then placed them in a trash receptacle to be picked up the next day.

When defendant returned to his residence, his sister saw that defendant was covered in blood and asked him what had happened. Defendant told his sister that he thought that he and the others "had just killed [the victim]." Defendant's sister assisted defendant in washing his bloody clothing. All the clothing came clean except for a small spot of blood on the T-shirt he had worn.

On 2 August 1996 the victim's father discovered the victim's body. Shortly thereafter members of the Onslow County Sheriff's Department and the Onslow County Emergency Medical Services arrived. An emergency medical technician determined that the victim was deceased. The cause of death was a combination of multiple stab wounds to the chest and abdomen, blunt trauma to the head, and massive lacerations to the neck. None of the weapons used to kill the victim were recovered at the murder scene.

Additional facts will be presented as needed to discuss specific issues.

On appeal to this Court, defendant brings forward sixteen assignments of error. For the reasons stated herein, we conclude that defendant's trial and capital sentencing proceeding were free of error and that the death sentence is not disproportionate.

## PRETRIAL ISSUES

[1] In his first assignment of error, defendant contends that the trial court erred in denying his motion for sequestration and segregation of the State's witnesses during motion hearings. In his motion defendant alleged "[t]hat a collective gathering of the State's witnesses during the motion hearings may well lead to a loss of individual recollection and the substitution of a 'mass consensus' recollection when the witnesses are actually called upon to testify." Defendant argues that the trial court's ruling allowing witnesses to hear the

testimony of one another on the same subject matter undermined his ability to effectively cross-examine those witnesses in violation of both the North Carolina and the United States Constitutions. We disagree.

"A ruling on a motion to sequester witnesses rests within the sound discretion of the trial court, and the court's denial of the motion will not be disturbed in the absence of a showing that the ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Call*, 349 N.C. 382, 400, 508 S.E.2d 496, 507-08 (1998). In this case, defendant has failed to show any abuse of discretion in the trial court's ruling. Moreover, although defendant claims that the denial of his motion to sequester violated several of his federal and state constitutional rights, he made no constitutional claims at trial. "Constitutional questions not raised and ruled upon at trial shall not ordinarily be considered on appeal." *Id.*, 508 S.E.2d at 508. Accordingly, we overrule this assignment of error.

[2] In his next assignment of error, defendant contends that the trial court erred by denying his motion to suppress and to exclude from evidence defendant's inculpatory statements made to Onslow County Sheriff Ed Brown, Onslow County Sheriff's Detective Len Condry, and Onslow County Sheriff's Detective Captain Keith Bryan on 1 November 1996. Defendant contends that the statements were involuntary since they were improperly obtained as a direct result of promises and threats made by the law enforcement officers. We disagree.

At the *voir dire* on defendant's motion, at which defendant testified, the trial court made certain findings of fact, which we summarize: On 1 November 1996 at 3:30 p.m. in an interview room of the Onslow County Sheriff's Department, Detective Condry advised defendant of his rights. Defendant waived his rights orally and in writing. Defendant remained in the locked interview room for approximately one hour while Detective Condry was interviewing another suspect. Defendant knocked on the door in order to go to the rest room, and Captain Bryan escorted defendant to the rest room and gave defendant access to a water fountain. While waiting back at the interview room, Captain Bryan told defendant that "if the defendant was asked any questions, it would be best if the defendant told the truth because the truth would come out anyway and it would take a load off of him." Captain Bryan never made any promises or threatened defendant.

Detective Condry moved defendant from the interview room down the hallway to the conference room. Before starting the examination, Detective Condry readvised defendant of his rights; and defendant agreed to talk with the officers. Defendant appeared coherent and did not appear to be impaired from alcohol or drugs. After initially denying any involvement in the murder, defendant admitted his participation in the murder. During the questioning, neither Detective Condry nor Sheriff Brown made any promises, threats, or suggestions of violence to defendant in order to induce him to make a statement. Defendant stated that a shirt he had worn when he committed the murder was located at his residence, and he gave the police permission to retrieve the shirt. Defendant also made a drawing of two of the murder weapons. The interview ended at approximately 6:30 p.m. Around 7:00 p.m. defendant rode with Detective Condry and Detective Frank Terwiliger to his residence to retrieve his shirt and was allowed to visit his mother, who lived at the residence. After leaving defendant's residence, the officers purchased food for defendant. The officers made no promises, threats, or suggestions of violence to defendant in order to persuade defendant to obtain the shirt. On 3 November 1996 during the booking of defendant, defendant "spontaneously and voluntarily told Detective Condry that he not only deserved the death penalty, but that he also wanted the death penalty."

Based upon its findings of fact, the trial court concluded that defendant's statements had been made after "defendant, on two occasions, freely, knowingly, intelligently, understandingly, and voluntarily waived his Miranda Rights." The trial court further concluded that none of defendant's constitutional rights were violated.

In *State v. Payne*, 327 N.C. 194, 208-09, 394 S.E.2d 158, 166 (1990), *cert. denied*, 498 U.S. 1092, 112 L. Ed. 2d 1062 (1991), this Court stated the following:

> North Carolina law is well established regarding this Court's role in reviewing a trial court's determination of the voluntariness of a confession.

> Findings of fact made by a trial judge following a voir dire hearing on the voluntariness of a confession are conclusive upon this Court if the findings are supported by competent evidence in the record. No reviewing court may properly set aside or modify those findings if so supported. This is true even though the evidence is conflicting.

*State v. Jackson,* 308 N.C. 549, 569, 304 S.E.2d 134, 145 (1983) (citations omitted).

We conclude that the trial court's findings were amply supported by competent evidence in the record.

Our next task is to determine whether the trial court's conclusion of law is supported by the findings. The trial court's conclusion of law that defendant's statements were voluntarily made is a fully reviewable legal question. *See State v. Hardy,* 339 N.C. 207, 222, 451 S.E.2d 600, 608 (1994). "[T]he court looks at the totality of the circumstances of the case in determining whether the confession was voluntary." *Jackson,* 308 N.C. at 581, 304 S.E.2d at 152. Factors the court considers are

> whether defendant was in custody, whether he was deceived, whether his Miranda rights were honored, whether he was held incommunicado, the length of the interrogation, whether there were physical threats or shows of violence, whether promises were made to obtain the confession, the familiarity of the declarant with the criminal justice system, and the mental condition of the declarant.

*Hardy,* 339 N.C. at 222, 304 S.E.2d at 608.

Applying these principles, we find no error in the trial court's conclusion. Defendant testified at the *voir dire* that he was read his *Miranda* warnings, that he understood his rights, that he did not want a lawyer, and that he signed the waiver. Defendant was coherent and not under the influence of any intoxicating substance during the interview. Defendant was familiar with the criminal justice system, having been previously arrested and convicted for assault on a female, possession of stolen property, and simple assault. The length of the interview was approximately two hours, and the record is devoid of any evidence that the atmosphere was inherently coercive or intimidating. Defendant's argument that Captain Bryan's statement to him "that it would take a load off of his shoulders if he would be honest because the truth would come out" constitutes an implicit promise that confessing would benefit him is not persuasive. *See State v. Corley,* 310 N.C. 40, 52, 311 S.E.2d 540, 547 (1984) (admitting defendant's statement after officer told him that "things would be a lot easier on him if he went ahead and told the truth"). Given the totality of circumstances, we conclude that the trial court did not err in concluding that defendant's statements were voluntarily made. This assignment of error is overruled.

STATE v. HYDE

[352 N.C. 37 (2000)]

## JURY SELECTION ISSUES

**[3]** In another assignment of error, defendant contends that the trial court erred by not requiring that prospective jurors swear to tell the truth during jury *voir dire*. We disagree. The record discloses that the jurors were properly sworn pursuant to N.C.G.S. § 9-14. While defendant concedes that an oath of truthfulness is not statutorily mandated, he nonetheless argues that the trial court's failure to require the jurors to tell the truth during *voir dire* tainted the jury selection process. However, defendant did not request that jurors so swear, nor did he object to any lack of oath during *voir dire*. Therefore, this assignment of error is not properly preserved for appellate review and is overruled. *See* N.C. R. App. P. 10(b)(1); *State v. Fleming*, 350 N.C. 109, 122, 512 S.E.2d 720, 731, *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 274 (1999). *See also State v. McNeil*, 349 N.C. 634, 643-44, 509 S.E.2d 415, 421 (1998).

**[4]** Next, defendant assigns error to the trial court's denial of his motion for individual *voir dire* and sequestration of the jurors during *voir dire*.

"In capital cases the trial judge for good cause shown may direct that jurors be selected one at a time, in which case each juror must first be passed by the State. These jurors may be sequestered before and after selection." N.C.G.S. § 15A-1214(j) (1999). "Whether to grant sequestration and individual *voir dire* of prospective jurors rests within the trial court's discretion and will not be disturbed on appeal absent a showing of an abuse of discretion." *Fleming*, 350 N.C. at 120, 512 S.E.2d at 729. A trial court will not be reversed for an abuse of discretion absent "a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Barts*, 316 N.C. 666, 679, 343 S.E.2d 828, 839 (1986).

Defendant's first argument in support of an abuse of the trial court's discretion in refusing to permit individual *voir dire* is that the trial court did not understand or follow the statutory process providing for collective *voir dire*. N.C.G.S. § 15A-1214 provides, in pertinent part:

(d) The prosecutor must conduct his examination of the first 12 jurors seated and make his challenges for cause and exercise his peremptory challenges. If the judge allows a challenge for cause, or if a peremptory challenge is exercised, the clerk must immediately call a replacement into the box. When the prosecu-

tor is satisfied with the 12 in the box, they must then be tendered to the defendant. Until the prosecutor indicates his satisfaction, he may make a challenge for cause or exercise a peremptory challenge to strike any juror, whether an original or replacement juror.

(e) Each defendant must then conduct his examination of the jurors tendered him, making his challenges for cause and his peremptory challenges. If a juror is excused, no replacement may be called until all defendants have indicated satisfaction with those remaining, at which time the clerk must call replacements for the jurors excused. The judge in his discretion must determine order of examination among multiple defendants.

(f) Upon the calling of replacement jurors, the prosecutor must examine the replacement jurors and indicate satisfaction with a completed panel of 12 before the replacement jurors are tendered to a defendant. Only replacement jurors may be examined and challenged. This procedure is repeated until all parties have accepted 12 jurors.

Defendant notes two instances where the trial court called replacement jurors for prospective jurors Donald Shipley, Marion Jones, Jr., and Antonio Kuhn contrary to the statutory selection process. We disagree. With respect to the first group of jurors, the record indicates that the State made its challenges for cause, exercised its peremptory challenges, and accepted twelve prospective jurors. Thereafter defendant made his challenges for cause, exercised his peremptory challenges, and accepted five jurors of the initial twelve. The trial court then seated seven more prospective jurors. The State repeated the process and passed the seven jurors to defendant. Defendant examined these seven jurors and successfully challenged for cause Mr. Shipley. Prior to defendant's exercise of peremptory challenges to the remaining six jurors, the trial court stated,

Let the record reflect the jury has exited the courtroom. Tomorrow morning we'll proceed with Ms. Geracos [defendant's counsel] going ahead and let [sic] us know what she wants to do about the remaining six jurors.

When court resumed, defendant renewed challenges for cause for Jones and Kuhn which had previously been denied. The trial court reconsidered and allowed those challenges for cause for these jurors

whom defendant had previously peremptorily excused. The following colloquy then transpired between the trial court, the defense counsel, and the prosecution:

> [DEFENSE COUNSEL]: Now we have more challenges. The other thing is since you have challenged Mr. Shipley, do you expect us to exercise our remaining challenges or challenge these jurors before the State examines, puts another juror back in seat number 1. They've not passed the full twelve at this point.

> THE COURT: I thought y'all would probably with this new development talk to your client and see what we want to do with the ones that exist right now and state's nodding its head in agreement with that. I think we ought to deal with these six jurors.

> [DEFENSE COUNSEL]: My position is the state is, they are to pass us a full box of 12 and right now we'll only have eleven because you've allowed the challenge for cause for Mr. Shipley.

> [PROSECUTOR]: That's correct.

> [PROSECUTOR]: Here's how it happened. We passed y'all full twelve. Y'all didn't challenge Mr. Shipley for cause until you started your examination. I think the appropriate thing to do is put somebody in the box and let them exercise their peremptory.

> THE COURT: In other words, let's go ahead and replace Mr. Shipley and let [the prosecutor] examine that juror number 1 and then we'll turn it back to [defense counsel], is that correct?

> [PROSECUTOR]: That will be fine.

> [DEFENSE COUNSEL]: That's agreeable, Your Honor.

Defendant notes another instance involving prospective juror James Graham, whom he had successfully challenged. Defendant again argues that the trial court acted contrary to statute by attempting to seat a juror before defendant passed on the only other juror he was questioning. We disagree. The following colloquy transpired between the trial court, defense counsel, and the prosecution in a bench conference:

> THE COURT: It may be six of one, half dozen of the other. What ran through my mind was whether or not you [defense counsel] wanted to go ahead and complete your questioning

process also with Mr. Beasley and maybe then make your motion [for cause]. I don't really care. We can do it either way. Well, basically not that we have to, but basically if we were eliminating someone for cause, then we're [sic] releasing another juror, then [the prosecutor] would take back over. I'm just thinking about in the interest of time whether or not anyone has an opinion about that of [sic] whether to go on with Mr. Beasley, and again I say that may be six of one—

[DEFENSE COUNSEL]: We would need a ruling, though, on the motion for challenging him for cause.

THE COURT: What I was thinking, did you get finished? You could come back to Mr. Graham and complete your questioning? Does anybody—

[PROSECUTOR]: I think that the Court, based upon what [defense counsel] just said, I think the Court probably needs to rule on the challenge for cause.

THE COURT: And go ahead and replace?

[PROSECUTOR]: No, I think they have to decide if they want the other and question him and we get the panel back after they've passed on them. They did not pass on them.

THE COURT: The consensus is we'll make a ruling on Mr. Graham?

[PROSECUTOR]: Yes, sir.

THE COURT: You complete your questioning on Mr. Beasley and then decide what you're going to do with Mr. Beasley and with Mr. Graham, depending on which way the decision goes. Everybody is nodding affirmatively. Is everybody in agreement?

[DEFENSE COUNSEL]: Yes, sir.

We conclude that the record discloses no confusion or error by the trial court. Defendant specifically requested or consented to any deviation from the prescribed statutory procedure. Moreover, defendant concedes that the trial court's jury selection method did not disadvantage or prejudice him.

[5] Defendant's second argument in support of an abuse of the trial court's discretion in refusing to sequester the jury is that the method

of questioning prospective jurors before other prospective jurors tainted the jury selection process against him. Specifically, defendant notes that one prospective juror stated that he would give one of defendant's potential witness' testimony less credibility since he knew the witness and that another prospective juror stated that she knew one of the defense lawyers and that the defense counsel had "misrepresented" her former son-in-law in a child abuse case. Defendant asserts that the trial court's abuse of discretion violated his Fourteenth Amendment right to due process and his Sixth Amendment right to a fair and impartial jury; however, defendant did not assert any constitutional basis for his motion in the trial court and has, thus, waived appellate review of this issue on constitutional grounds. *See Fleming*, 350 N.C. at 122, 512 S.E.2d at 730. Further, in his brief defendant argues only that the damage to defendant from these statements made in open court in the presence of jurors and prospective jurors is obvious. Taken to its logical conclusion, defendant's argument would require individual *voir dire* in every capital case to avoid the potential of a prospective juror saying something unexpected. We conclude that defendant has failed to demonstrate any prejudice in the manner in which the jury was selected and how the trial court abused its discretion in denying defendant's motion. Accordingly, we overrule this assignment of error.

[6] In the next assignment of error, defendant contends that the jury selection procedure prescribed in N.C.G.S. § 15A-1214(d) through (f) is unconstitutional since it allows the prosecutor a greater number of prospective jurors from which to choose than it allows defendant. As in *Fleming*, defendant did not raise this constitutional issue at trial; therefore, defendant has failed to preserve this assignment of error for appellate review. N.C. R. App. P. 10(b)(1); *see Fleming*, 350 N.C. at 122, 512 S.E.2d at 730 (holding that defendant waived appellate review of constitutional issue since issue was not raised at trial); *State v. Flippen*, 349 N.C. 264, 276, 506 S.E.2d 702, 709-10 (1998) (same), *cert. denied*, 526 U.S. 1135, 143 L. Ed. 2d 1015 (1999). This assignment of error is overruled.

[7] By another assignment of error, defendant contends that the trial court erred by excusing, deferring, or disqualifying several prospective jurors prior to defendant's case being called for trial. Defendant argues that the trial court improperly excused these jurors because of stated religious scruples and for reasons other than compelling personal hardship or because the service would be contrary to the public welfare, health, or safety. *See* N.C.G.S. § 9-6(a) (1999). He claims

that he was deprived of the right to reject prospective jurors in violation of his constitutional rights. We disagree.

N.C.G.S. § 9-6(a) provides in pertinent part:

(a)  The General Assembly hereby declares the public policy of this State to be that jury service is the solemn obligation of all qualified citizens, and that excuses from the discharge of this responsibility should be granted only for reasons of compelling personal hardship or because requiring service would be contrary to the public welfare, health, or safety.

(b)  Pursuant to the foregoing policy, each chief district court judge shall promulgate procedures whereby he . . . , prior to the date that a jury session (or sessions) of superior or district court convenes, shall receive, hear, and pass on applications for excuses from jury duty. . . .

. . . .

(f)  The discretionary authority of a presiding judge to excuse a juror at the beginning of or during a session of court is not affected by this section.

"Decisions concerning the excusal of prospective jurors are matters of discretion left to the trial court." *State v. Neal*, 346 N.C. 608, 619, 487 S.E.2d 734, 741 (1997), *cert. denied*, 522 U.S. 1125, 140 L. Ed. 2d 131 (1998). Based on a review of the record, we conclude that the trial court did not commit error in excusing prospective jurors prior to the calling of defendant's case.

Assuming *arguendo* that the trial court failed to comply with the statute strictly, defendant is not entitled to a new trial absent a showing of "corrupt intent, discrimination or irregularities which affected the actions of the jurors actually drawn and summoned." *State v. Murdock*, 325 N.C. 522, 526, 385 S.E.2d 325, 327 (1989). Other than defendant's blanket conclusion that the trial court's actions in excusing these jurors were arbitrary and capricious, defendant has failed to demonstrate corrupt intent or that he was prejudiced by the jury that was impaneled.

"Defendant's right to be present at all stages of his trial does not include the right to be present during preliminary handling of the jury venires before defendant's own case has been called." *State v. Workman*, 344 N.C. 482, 498, 476 S.E.2d 301, 309-10 (1996); *see also State v. Cole*, 331 N.C. 272, 415 S.E.2d 716 (1992) (not error to excuse

prospective jurors after unrecorded bench conferences when trial had not commenced). The record reflects and defendant acknowledges that the jury was impaneled before the State called defendant's case for trial. We conclude that defendant had no right to be present during the preliminary qualification of prospective jurors since the jurors were excused before defendant's trial began. Accordingly, we overrule this assignment of error.

[8] In his next assignment of error, defendant contends that the trial court erred by sustaining objections to his questioning of prospective jurors about their ability to consider a life sentence. Specifically, defendant contends that the trial court limited his *voir dire* of prospective jurors Wilkie, Whaley, and Marshburn.

The examination of prospective juror Wilkie is representative of the questioning of the other two prospective jurors at issue in this case which defendant claims chilled his ability to question succeeding prospective jurors in violation of his right to a fair and impartial jury. In the first round of *voir dire*, the trial court sustained an objection to the form of the following questions on the ground that defendant was "staking out" the juror:

Q. . . . Mr. Wilkie, if a person intentionally takes the life of another, they are convicted of first degree murder, do you think that he should get the death penalty and should not get life?

. . . .

Q. Mr. Wilkie, I take it from what you're saying, sir, that your attitude is strong enough about the death penalty that we would have to prove to you that and offer you evidence that you should spare his life and—

. . . .

Q. So if we didn't offer any mitigating circumstances you would then feel that if we offered none you would vote for the death penalty then, wouldn't you?

. . . .

Q. Well, then, what you're saying, sir, is if we offered no mitigating circumstances you would, in fact, automatically vote for the death penalty.

. . . .

**STATE v. HYDE**

[352 N.C. 37 (2000)]

Q. Well, if we offered no evidence at all would[] you still consider life in prison without parole?

"The extent and manner of questioning during jury *voir dire* is within the sound discretion of the trial court." *State v. Richardson*, 346 N.C. 520, 529, 488 S.E.2d 148, 153 (1997), *cert. denied*, 522 U.S. 1056, 239 L. Ed. 2d 652 (1998). In order to reverse a conviction based on an error in the jury selection process, defendant must demonstrate "a clear abuse of discretion, as well as prejudice." *Id.*

"Counsel may not pose hypothetical questions designed to elicit in advance what the juror's decision will be under a certain state of the evidence or upon a given state of facts." *State v. Vinson*, 287 N.C. 326, 336, 215 S.E.2d 60, 68 (1975), *death sentence vacated*, 428 U.S. 902, 49 L. Ed. 2d 1206 (1976). "[S]uch questions tend to 'stake out' the juror and cause him to pledge himself to a future course of action." *Id.* Defendant contends the questions excluded by the trial court prevented him from asking juror Wilkie whether he would automatically impose the death penalty upon convicting defendant of first-degree murder.

Even if it be assumed without deciding that the questions were proper, defendant cannot prevail on this issue. Although defendant exercised a peremptory challenge to excuse Marshburn, he accepted jurors Wilkie and Whaley and did not exhaust all his peremptory challenges. Defendant cannot demonstrate prejudice in the jury selection process if he does not exhaust his peremptory challenges. *See* N.C.G.S. § 15A-1214(h); *State v. Billings*, 348 N.C. 169, 182, 500 S.E.2d 423, 431 (no prejudice results from the trial court's limiting defendant's questioning of a prospective juror where defendant does not exhaust his peremptory challenges), *cert. denied*, 525 U.S. 1005, 142 L. Ed. 2d 431 (1998); *State v. McCarver*, 341 N.C. 364, 378, 462 S.E.2d 25, 32 (1995) (same), *cert. denied*, 517 U.S. 1110, 134 L. Ed. 2d 482 (1996). Thus, we conclude that defendant cannot demonstrate prejudice resulting from the trial court's rulings. This assignment of error is overruled.

## GUILT/INNOCENCE ISSUES

[9] Next, defendant assigns error to the trial court's denial of his pretrial motion *in limine* to exclude or limit photographs of the crime scene and of the autopsy and a motion to limit the number of photographs of the victim. Defendant argues that these photographs had no probative value and that they were excessive and inflamma-

tory. Defendant argues that these gory photographs were so prejudicial that he is entitled to a new trial. We find that none of defendant's arguments has merit.

"Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury." *State v. Hennis*, 323 N.C. 279, 284, 372 S.E.2d 523, 526 (1988). "Even where a body is in advanced stages of decomposition and the cause of death and identity of the victim are uncontroverted, photographs may be exhibited showing the condition of the body and its location when found." *State v. Wynne*, 329 N.C. 507, 517, 406 S.E.2d 812, 816-17 (1991). Photographs depicting "[t]he condition of the victim's body, the nature of the wounds, and evidence that the murder was done in a brutal fashion [provide the] circumstances from which premeditation and deliberation can be inferred." *State v. Warren*, 348 N.C. 80, 111, 499 S.E.2d 431, 448, *cert. denied*, 525 U.S. 915, 142 L. Ed. 2d 216 (1998). "The large number of photographs, in itself, is not determinative." *State v. Goode*, 350 N.C. 247, 259, 512 S.E.2d 414, 421 (1999).

The trial court allowed the State to use approximately fifty-one photographs. These photographs, albeit numerous, were unique in subject matter and in detail in that they all depicted the exceedingly large number of wounds inflicted upon different parts of the victim's body by various weapons, including a knife, a drill bit, a pipe, an ax head, and a limb or pruning saw. They depicted the condition of the victim's body, its location, and the crime scene. The photographs also corroborated defendant's confession in that they demonstrated that the victim was attacked in his bedroom, that he fell to the floor with his head toward the closet, that he was stabbed while on the floor, and that his neck was cut with a saw while on the floor. Further, the autopsy photographs illustrated the testimony of the medical examiner, who described which injuries were consistent with a particular weapon. We conclude that the photographs were relevant and had probative value.

We must now determine whether the prejudicial effect of the photographs outweighs their probative value. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.G.S.

§ 8C-1, Rule 403 (1999); *see also State v. Hennis*, 323 N.C. 279, 372 S.E.2d 523. This determination is within the sound discretion of the trial court, and the trial court's ruling should not be overturned on appeal unless the ruling was "manifestly unsupported by reason or [was] so arbitrary that it could not have been the result of a reasoned decision." *Hennis*, 323 N.C. at 285, 372 S.E.2d at 527.

After having reviewed the photographs and determined that they were relevant and probative, that they corroborated defendant's confession, that they illustrated the medical examiner's testimony, and that they contributed to the finding of premeditation and deliberation, we cannot say that the trial court's decision to admit these photographs was so arbitrary that it could not have been supported by reason. Accordingly, we overrule this assignment of error.

## SENTENCING ISSUES

[10] By another assignment of error, defendant contends that the trial court erred in submitting, over defendant's objection, the aggravating circumstance that the murder was committed to avoid lawful arrest. Defendant argues that the evidence did not support the submission of this aggravating circumstance to the jury. We disagree.

N.C.G.S. § 15A-2000(e)(4) provides that a jury in a capital sentencing hearing may consider as an aggravating circumstance that "[t]he capital felony was committed for the purpose of avoiding or preventing a lawful arrest." N.C.G.S. § 15A-2000(e)(4) (1999). "Submission of the aggravating circumstance that the capital felony was committed to avoid or prevent a lawful arrest has been upheld in circumstances where a murder was committed to prevent the victim from capturing defendant and where a purpose of the killing was to eliminate a witness." *McCarver*, 341 N.C. at 400, 462 S.E.2d at 45.

The evidence in the case before us tends to show that defendant burglarized the victim's residence and that he killed him since he believed the victim would report him to the authorities. While defendant was describing the assault on the victim in his statement to police investigators, Sheriff Brown asked defendant, "[W]hat was your intention when you used the saw?" Defendant replied, "I guess to kill him . . . . I guess we thought he would tell the next day if we didn't [kill him] after all we did." "Trying to kill him. After all the other stuff[,] if we didn't kill him we knew he would tell on us the next day." Further, this statement is corroborated by another statement defendant made to his girlfriend, Ginger Guthrie, shortly after

the victim was murdered. Ms. Guthrie testified that defendant said that "he wasn't for sure about [whether the victim would say anything] after all that he knows he stabbed him with the drill bit and everything; he wasn't too sure about that."

Defendant argues that his statement to the law enforcement officers three months after the murder evidences an " 'after-the-fact desire not to be detected or apprehended' " and " 'cannot raise a reasonable inference that at the time of the killing defendant killed for the purpose of avoiding lawful arrest.' " (Quoting *State v. Williams*, 304 N.C. 394, 425, 284 S.E.2d 437, 456 (1981), *cert. denied*, 456 U.S. 932, 72 L. Ed. 2d 450 (1982). This argument is without merit. We conclude that the evidence was sufficient to support a rational jury's finding that one of defendant's purposes for killing the victim was to eliminate a witness whom he thought would report him to the authorities. Therefore, the trial court properly submitted this aggravating circumstance for the jury's consideration. This assignment of error is overruled.

[11] In the next assignment of error, defendant contends that the trial court erred in allowing the prosecutor to make an allegedly improper closing argument. Specifically, he argues that he was prejudiced by the prosecutor's statements suggesting that the imposition of the death penalty was warranted since the victim was killed in his own home. Defendant argues that these statements improperly placed before the jury an aggravating circumstance not listed in N.C.G.S. § 15A-2000(e). We disagree.

During the sentencing hearing, defendant failed to object during closing argument. Thus, "defendant must establish that the argument was so grossly improper that the trial court abused its discretion by not intervening *ex mero motu*. To establish such an abuse, defendant must show the prosecutor's comments so infected the trial with unfairness that it rendered the conviction fundamentally unfair." *State v. Robinson*, 346 N.C. 586, 606-07, 488 S.E.2d 174, 187 (1997).

"Trial counsel is allowed wide latitude in argument to the jury and may argue all of the evidence which has been presented as well as reasonable inferences which arise therefrom." *State v. Guevara*, 349 N.C. 243, 257, 506 S.E.2d 711, 721 (1998), *cert. denied*, 526 U.S. 1133, 143 L. Ed. 2d 1013 (1999). The trial court's exercise of discretion over the latitude of counsel's argument will not be disturbed absent any gross impropriety in the argument that would likely influence the

jury's verdict. *See State v. McNeil*, 350 N.C. 657, 685, 518 S.E.2d 486, 503 (1999), *cert. denied*, —— U.S. ——, 146 L. Ed. 2d 321 (2000).

The evidence in this case tends to show that defendant and others committed the first-degree murder of the victim while engaged in first-degree burglary. Based on this evidence, the trial court had a duty to submit the aggravating circumstance that "[t]he capital felony was committed while the defendant was engaged, or was an aider or abettor, in the commission of . . . burglary." N.C.G.S. § 15A-2000(e)(5). The offense of first-degree burglary necessarily requires that the dwelling be actually occupied at the time of intrusion. *See State v. Fields*, 315 N.C. 191, 196, 337 S.E.2d 518, 521 (1985). The prosecutor's statements about the victim being killed in his home served to inform the jury about this aggravating circumstance. Contrary to defendant's contention, the prosecutor's argument did not compel the imposition of the death sentence upon any circumstance not listed in N.C.G.S. § 15A-2000(e). We conclude that the prosecutor's argument was not so "grossly improper" as to require the trial court to intervene *ex mero motu*. This assignment of error is overruled.

[12] In his final assignment of error, defendant contends that the trial court erred in denying his requests to instruct the jury that statutory mitigating circumstances have mitigating value. Defendant further argues that the instructions given did not adequately address the significant distinction between statutory and nonstatutory mitigating circumstances. We disagree.

"A trial court must give a requested instruction that is a correct statement of the law and is supported by the evidence." *State v. Conner*, 345 N.C. 319, 328, 480 S.E.2d 626, 629, *cert. denied*, 522 U.S. 876, 139 L. Ed. 2d 134 (1997). "The trial court need not give the requested instruction verbatim, however; an instruction that gives the substance of the requested instructions is sufficient." *Id.*

"If a juror determines that a statutory mitigating circumstance exists, . . . the juror must give that circumstance mitigating value. The General Assembly has determined as a matter of law that statutory mitigating circumstances have mitigating value." *State v. Jaynes*, 342 N.C. 249, 285, 464 S.E.2d 448, 470 (1995) (citations omitted), *cert. denied*, 518 U.S. 1024, 135 L. Ed. 2d 1080 (1996). The thrust of defendant's argument is that the jury may not have fully understood that the statutory mitigating circumstances have mitigating value as a matter of law. This Court has considered and rejected this argument in *State*

*v. Simpson*, 341 N.C. 316, 348-49, 462 S.E.2d 191, 209-10 (1995), *cert. denied*, 516 U.S. 1161, 134 L. Ed. 2d 194 (1996), and in *Conner*, 345 N.C. at 328, 480 S.E.2d at 629.

Here, the trial court gave virtually identical instructions to the jury with regard to the (f)(1), (f)(2), (f)(6), (f)(7), and (f)(8) mitigating circumstances, in part, as follows:

> Accordingly, as to this mitigating circumstance, I charge you that if one or more of you find the facts to be as all . . . the evidence tends to show, you will answer "yes" as to mitigating circumstance number one on the issues and recommendation form.

With respect to all of the nonstatutory mitigating circumstances, the trial court instructed the jury, in part, as follows:

> If one or more of you find by a preponderance of the evidence that any of the following circumstances exist and also are deemed by you to have mitigating value, you would so indicate by having your foreperson write "yes" in the space provided. If none of you find any circumstance to exist or if none of you deem it to have mitigating value, you would so indicate by having your foreperson write "no" in that space.

The trial court also gave a virtually identical instruction after setting out each nonstatutory mitigating circumstance.

With respect to the statutory catchall mitigating circumstance, the trial court instructed the jury as follows:

> If one or more of you so find by a preponderance of the evidence, you would so indicate by having your foreperson write "yes" in the space provided after this mitigating circumstance on the issues and recommendation form. If none of you find the circumstance to exist, you would so indicate by having your foreperson write "no" in that space.

The instructions given with respect to Issues Three and Four required the jury to give weight to any found mitigating circumstances. As we noted in *Conner*, "defendant's request for an instruction that conveyed to the jury that it must give value to found statutory mitigators was fulfilled by the instruction given." 345 N.C. at 328, 480 S.E.2d at 629. We conclude the same in this case. Further, these instructions are consistent with the pattern jury instructions for separate capital sentencing proceedings. *See* N.C.P.I.—Crim. 150.10

(1996) (amended June 1997). Accordingly, we overrule this assignment of error.

## PROPORTIONALITY

**[13]** Finally, this Court exclusively has the statutory duty in capital cases to review the record and determine (i) whether the record supports the aggravating circumstances found by the jury; (ii) whether the death sentence was entered under the influence of passion, prejudice, or any other arbitrary factor; and (iii) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2). Having thoroughly reviewed the record, the transcripts, and briefs in the present case, we conclude that the record fully supports the aggravating circumstances found by the jury. Further, we find no suggestion that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration. Accordingly, we turn to our final statutory duty of proportionality review.

**[14]** The jury found defendant guilty of first-degree murder on the basis of premeditation and deliberation and under the felony-murder rule, first-degree burglary, and conspiracy to commit first-degree burglary. At defendant's capital sentencing proceeding, the jury found the three submitted aggravating circumstances: (i) that the murder was committed to avoid lawful arrest, N.C.G.S. § 15A-2000(e)(4); (ii) that the murder was committed while defendant was engaged, in the commission of a burglary, N.C.G.S. § 15A-2000(e)(5); and (iii) that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9).

The jury found five statutory mitigating circumstances that: (i) defendant had no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1); (ii) the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); (iii) defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired, N.C.G.S. § 15A-2000(f)(6); (iv) defendant aided in the apprehension of another capital felon, Joel Coleman, N.C.G.S. § 15A-2000(f)(8); and (v) defendant aided in the apprehension of another capital felon, James Blake, N.C.G.S. § 15A-2000(f)(8). Two other statutory mitigating circumstances were submitted but not found: (i) defendant's age at the time of the crime, N.C.G.S. § 15A-2000(f)(7); and (ii) the catchall, N.C.G.S.

§ 15A-2000(f)(9). Of the thirty-four nonstatutory mitigating circumstances submitted, the jury found twenty-four that had mitigating value.

We begin our analysis by comparing this case to those cases in which this Court has determined the sentence of death to be disproportionate. We have determined the death penalty to be disproportionate on seven occasions. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate.

Several characteristics in this case support the determination that the imposition of the death penalty was not disproportionate. Defendant was convicted of both felony murder and premeditated and deliberate murder. We have noted that "the finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Moreover, defendant killed the defenseless victim in his home. "A murder in the home 'shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a right to feel secure.' " *State v. Adams*, 347 N.C. 48, 77, 490 S.E.2d 220, 236 (1997) (quoting *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987)) (alterations in original), *cert. denied*, 522 U.S. 1096, 139 L. Ed. 2d 878 (1998).

We also consider cases in which this Court has found the death penalty to be proportionate. "However, we will not undertake to discuss or cite all of those cases each time we carry out that duty." *State v. McCollum*, 334 N.C. 208, 244, 433 S.E.2d 144, 164 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). We conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence disproportionate or to those in which juries have consistently returned recommendations of life imprisonment.

We conclude that defendant received a fair trial and capital sentencing proceeding, free from prejudicial error, and that defendant's death sentence was not excessive or disproportionate. The judgments of the trial court are, therefore, left undisturbed.

NO ERROR.

Justice WAINWRIGHT did not participate in the consideration or decision of this case.